COLUMBIA METAL BOX CO. v. HALPER.

(Circuit Court of Appeals, Second Circuit. January 12, 1915.)

No. 124.

1. PATENTS ⬥35—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.
The commercial success of an article is not a test of patentable invention, although in a doubtful case that fact may lead the court to sustain the patent.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 39; Dec. Dig. ⬥35.
Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.]

2. PATENTS ⬥21—INVENTION—SUBSTITUTION OF ONE MATERIAL FOR ANOTHER.
The substitution of one well-known material for another, unaccompanied by any actual advance in the art or genuine benefit to the public, does not amount to patentable invention.
[Ed. Note.—For other cases, see Patents. Cent. Dig. § 23; Dec. Dig. ⬥21.]

3. PATENTS ⬥328—VALIDITY—SHEET METAL JUNCTION BOX.
The Blackman patent, No. 963,352, for a sheet metal junction box for use in electric wiring, held void for lack of invention in view of the prior art, which included a cast iron box having the same form of construction as that claimed as new in the patent.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here on appeal from a decree entered on June 11, 1914, in the District Court of the United States for the Southern District of New York, dismissing the bill of complaint in a suit brought in equity to restrain an infringement of United States letters patent No. 963,352 and to obtain an accounting for profits and to recover damages.

The complainant, the Columbia Metal Box Company, is a corporation organized and existing under the laws of the state of New York and having its principal office in the city and State of New York, and is engaged in the manufacture and sale of sheet metal junction boxes.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Samuel M. Halper trades under the name of the Star Metal Box Company, and has an established place of business in the Southern district of New York.

United States letters patent No. 963,352 were granted on July 5, 1910, to Albert E. Blackman, of Mt. Vernon, N. Y., for sheet metal junction boxes. The entire right, title, and interest in this patent the said Blackman assigned, sold, and set over to the complainant, the Columbia Metal Box Company, on May 31, 1912. The usual defenses to a suit for infringement are set up in the answer, but the defense mainly relied upon the lack of patentable invention over the prior art.

The case was twice heard in the court below. On the first hearing the court sustained the patent. A rehearing was asked on the ground of newly discovered evidence, and such rehearing was granted. The newly discovered evidence consisted in substance of a cast metal box known as the General Electric box which is alleged to have been made and sold by the General Electric Company long prior to the date of the complainant's invention. After the rehearing, the court, in view of the added evidence, changed its opinion and held the patent invalid.

Newell & Neal, of New York City, for appellant.
Otto Munk, of New York City, for appellee.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The patent in suit is for a sheet metal junction box used in the electric wiring art. In the installation of electric wiring for lighting and other purposes there is located at the junction between the main line and the local circuit a fuse plug and a cut-out switch, so that any damage to the local line will not interfere with the main line, and the local line can be cut out when desired. The fuse plug and cut-out switch are mounted on an insulating slab and inclosed in a junction box. The purpose of a junction box, as shown by the testimony, is to provide a suitable compartment to contain different fuses and switches necessary for use in an electric wiring installation. It is also used as a metallic connector between the conduits on an electrical installation, and may at some time carry current in case one of the wires of an electrical installation should come in contact with the conduit in which it is installed. At the present time these junction boxes, formerly made of wood and of cast iron, are nearly all made of sheet metal. For use within the walls of a building the box should be fireproof, and for use in exposed places it should protect its contents from rain, dust, and other foreign material. The boxes are usually provided with a hinged cover, so as to give easy access to the interior of the box for operating the switch and renewing the fuse when required. Up to the time of the invention of the patent in suit the type of junction box nearly in universal use was made of sheet metal, the body having a cover hinged thereto by means of ordinary door hinges riveted thereon. This box is known in the trade as the butt hinge type of box, and it came into use about 1906, gradually displacing the old wooden boxes and cast iron boxes previously used. It was as an improvement upon this sheet metal butt hinge box that the patent in suit was made.

The patent in suit was granted to Albert E. Blackman. In his specification Blackman states his claim as follows:

"A sheet metal box, composed of a single sheet of metal folded up on four sides to form the walls of the box, and provided with integral portions of

each side extending beyond the adjacent wall to form a support for a pivotal connection, a cover for the box formed of a single blank of sheet metal having its edges folded to fit the box and provided at opposite sides with integral extensions outside of the adjacent wall of said box and fastened to the integral extensions from said box by a pivotal connection, the turned-over edge of one end of said cover which is adjacent the pivotal connection to the body of the box being located inside of the integral extensions from the main portion of the box, but overlapping the end wall of said box and free from contact therewith."

In his specification Blackman declares that his object was to simplify the construction of sheet metal boxes. He states that:

"In metal boxes for use as switch boxes or cut-out boxes, cheapness of construction is a material factor, and one of the comparatively expensive parts of the cost of assembling such a box is the pivot connection between the cover and the main body of the box. By my construction I have dispensed with the necessity of any separate pivot connections such as are usually employed, thereby reducing the cost of the box, and have attained other advantages."

The testimony shows that in the matter of cost the patent in suit saved from two to ten cents a box, depending on the size of the box, or an average of five cents per box over the butt hinge type. The importance of this saving is realized when one understands that thousands of these boxes are made and sold every day; the complainant alone selling on an average of from 500 to 1,000 per day.

[1] Some 500 of the complainant's junction boxes are installed along the Blackwell Island Bridge at Fifty-Ninth street in New York City to protect the switches and fuses of the different electric lights on that bridge. That complainant's box has been a commercial success must be acknowledged. But the commercial success of an article is not a test of patentability, although in a doubtful case that fact might lead the court to sustain the patent. In Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 495 (23 L. Ed. 952 [1876]), the Supreme Court, speaking to this point, said:

"We do not say the single fact that a device has gone into general use, and has displaced other devices which have previously been employed for analogous uses, establishes in all cases that the later device involves a patentable invention. It may, however, always be considered; and, when the other facts in the case leave the question in doubt, it is sufficient to turn the scale."

In Magowan v. New York Belting Co., 141 U. S. 332, 343, 12 Sup. Ct. 71, 35 L. Ed. 781 (1891), the fact was remarked, and evidently had much weight, that the patented product went at once into such an extensive public use, as almost to supersede products made for a like purpose under other methods. That fact was regarded as pregnant evidence of its novelty, value, and usefulness. And this success was attained, although the new product was put upon the market at a price from 15 to 20 per cent. higher than the older products, notwithstanding it cost 10 per cent. less to produce it.

The question which the trial court considered was whether the adaptation of a form of hinged cover not wholly unknown to the peculiar requirements of the new art of electric wiring constituted invention. At the first hearing the court stated that it did not appear that the form of hinging shown by the patented device had ever before been

used for the purpose sought by the inventor. And it concluded that the method of hinging used produced a tight cover without the use of the strap or butt hinges. While thinking this a small thing, the court declared it useful and desirable, a novel and meritorious device, and sustained the patent. On rehearing, after the introduction in evidence of the General Electric cast metal box, the trial court reached the conclusion that the very form of cover which the patentee of the patent in suit claimed as new had been used for electric wiring purposes before the earliest invention date claimed by complainant.

[2] The earliest date of invention claimed by the patentee of the patent in suit is March, 1908, and the evidence shows that early in 1907 the General Electric Company manufactured the General Electric box. The General Electric box was made of cast iron, while the box of the patent in suit is made of sheet iron. It may be conceded a junction box made of sheet metal has an advantage over the box of the General Electric Company in lightness, strength, and cheapness. But these advantages are due solely to the inherent qualities of the material employed. And in Drake Castle Pressed Steel Lug Co. v. Brownell & Co., 123 Fed. 86, 59 C. C. A. 216, the Circuit Court of Appeals for the Sixth Circuit declared:

"The substitution of steel or wrought iron for cast iron as the material from which a structure is made does not constitute patentable invention, although such change of material also involves a change in the method of construction and in form; the new article being stamped or swaged from a single sheet of metal. When made it performs the same function in substantially the same way; its only advantage over the old structure being attributable to the inherent qualities of the material used."

And we have held in a number of cases that the substitution of one well-known material for another does not necessarily amount to patentable invention. See American Acetylene Burner Co. v. Kirchberger, 142 Fed. 745, 74 C. C. A. 77, affirmed in 147 Fed. 253, 77 C. C. A. 392; New York Belting & Packing Co., Ltd., v. Sierer, 158 Fed. 819, 86 C. C. A. 79.

Whether the substitution of one material for another amounts to patentable invention depends upon circumstances, and the rule governing the subject was well stated by Judge Coxe in Union Hardware Co. v. Selchow (C. C.) 112 Fed. 1006 (1901). It was there said:

"Where the inventor has discovered new and unknown properties residing in a given material, or that a long sought for result, which has baffled an army of skilled artisans, can be achieved by the change, in such cases the substitution of one material for another may reach the plare of invention. But substitution alone, unaccompanied by any actual advance in the art or genuine benefit to the public, has uniformly been held insufficient to support a patent."

In the above case, by the use of cheaper, lighter, and stronger metal, a skate was made cheaper, lighter, and stronger; but the skate operated after the change precisely as it did before, and the substitution of material was held not to amount to patentable invention.

In George Frost Co. v. Cohn (C. C.) 112 Fed. 1009, decided at the same time as the Selchow Case, a rubber button was substituted for a metal button in a hose supporter. The effect of the substitution was to transform a destructive and inoperative device into a highly suc-

cessful one. This was held to amount to patentable invention, and on appeal the decision below was affirmed by this court, which said:

"When the substitution has accomplished a result which those skilled in the art had long and vainly sought to effect, the evidence that it involved something beyond the skill of the calling is so persuasive that it generally resolves the inquiry in favor of patentable novelty."

The subject has been before the Supreme Court of the United States. In Hotchkiss v. Greenwood, 11 How. 249, 13 L. Ed. 683 (1850), the Supreme Court had under consideration the substitution of a knob made of clay in a peculiar form for a knob of metal or wood. The question was whether this substitution amounted to patentable invention, and the court held that it could not be so regarded. The court, through Mr. Justice Nelson, said:

"Now it may very well be that, by connecting the clay or porcelain knob with the metallic shank in this well-known mode, an article is produced better and cheaper than in the case of the metallic or wood knob; but this does not result from any new mechanical device or contrivance, but from the fact that the material of which the knob is composed happens to be better adapted to the purpose for which it is made. The improvement consists in the superiority of the material, and which is not new, over that previously employed in making the knob. But this, of itself, can never be the subject of a patent. No one will pretend that a machine, made, in whole or in part, of materials better adapted to the purpose for which it is used than the materials of which the old one is constructed, and for that reason better and cheaper, can be distinguished from the old one, or, in the sense of the patent law, can entitle the manufacturer to a patent. The difference is formal, and destitute of ingenuity or invention. It may afford evidence of judgment and skill in the selection and adaptation of the materials in the manufacture of the instrument for the purposes intended, but nothing more."

And in Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 495, 23 L. Ed. 952 (1876), the Supreme Court held that the substitution of hard rubber in lieu of the materials previously used for a plate for holding artificial teeth, or such teeth and gums, was a superior product, having capabilities and performing functions which differed from anything which preceded it, and which could not be ascribed to mere mechanical skill, but was to be justly regarded as the result of inventive effort, and as making the manufacture of which they are attributes a novel thing in kind, and consequently patentable as such.

In Brown v. District of Columbia, 130 U. S. 88, 9 Sup. Ct. 437, 32 L. Ed. 863 (1888), the Supreme Court held that the substitution of blocks of wood of a given shape for blocks of stone of the same shape in the construction of a pavement neither involved a new mode of construction, nor developed anything substantially new in the resulting pavement, and was therefore not patentable as an invention. And in the same case a patent for an improved mode of cutting blocks for street pavements was held void, because the thing patented required only mechanical skill and involved no invention.

But enough has been said to show that if complainant had been the first to substitute sheet metal for cast iron or wood, and as a consequence had made a box which was cheaper and more durable than the boxes which were previously constructed, he would not on that account alone be entitled to maintain the patent.

[3] It is claimed, however, on behalf of the patentee, that when a

new method of manufacture is involved in the use of the new material, invention should be held to exist if the new method of manufacture involved in the use of the new material would not occur to the ordinary mechanic. And such is undoubtedly the law. The difficulty with the complainant's case is that the court is not satisfied that the new method of manufacture is one which would not have occurred to an ordinary mechanic. We think that a competent mechanic, with the General Electric box before him, could by mechanical skill alone make the same thing for the same purpose from sheet metal.

Invention is not involved in the making of integrally extending hinge portions for the cover, over the casting of hinge lugs for the cover of a cast iron box, such as the box of the General Electric Company. We have not overlooked the testimony of the patentee that a cast iron junction box like that of the General Electric box would not teach the ordinary mechanic how to make a sheet metal box with the body of one piece and a cover of one piece hinged together like the patent in suit. No doubt he believed what he said, but we do not share his opinion that an ordinary mechanic could not have worked out the result.

The appellant objects to the exclusion of certain evidence. The court at the original trial excluded evidence designed to show how much cheaper boxes could be constructed in accordance with the method specified in the patent than in the case of the old type of butt hinge box. But it is, under the circumstances of the case, quite immaterial whether the box of the patent in suit costs less than it costs to manufacture the butt hinge or the cast iron box. The fact that the box of the patent in suit costs less does not make it patentable. And if such evidence were material the evidence already in the case disclosed the fact. And there was no error committed in excluding testimony to show that after the injunction issued it was necessary to go back to the butt hinge, and that it was necessary to raise the price for the old butt hinge type.

It is also assigned as error that a superintendent of electrical construction called as a witness for complainant was not allowed to state what advantages, if any, from an electrical standpoint, result from a box constructed in accordance with the patent in suit. It is proper to say that the trial court excluded the question as opposed to rule 5 of the Equity Rules of the District Court, which provides that in the trial of a patent cause only one expert witness shall be allowed to each side, unless leave shall have previousy been obtained from the court, on motion made and cause shown. One expert had aready testified, and leave had not previously been obtained, or any motion made or cause shown, for the examination of any additional expert.

We find no error. Judgment affirmed.