## BELL TELEPHONE LABORATORIES, Inc., et al. v. INTERNATIONAL STANDARD ELECTRIC CORPORATION.

### No. 1233.

District Court, D. Delaware.
June 1, 1939.

E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., and J. W. Schmied, Edgar W. Adams, and Claude C. Rose, all of New York City, for plaintiffs.

Hugh M. Morris and Alexander L. Nichols, both of Wilmington, Del., and Paul Kolisch, Roy C. Hopgood, and Edward D. Phinney, all of New York City, for defendant.

NIELDS, District Judge.

This is a suit in equity under sections 4911 and 4915 of the Revised Statutes of the United States. Title 35, U.S.C.A. §§ 59a and 63. The suit seeks a decree authorizing the Commissioner of Patents to grant to plaintiffs a patent including claims corresponding to claims 13, 23, 29 and 32 of patent No. 1,895,112 to Vernam.

The plaintiff Bell Telephone Laboratories, Incorporated, is a subsidiary of American Telephone and Telegraph Company. It is assignee of Locke and Kinkead who filed an application for letters patent on June 7, 1930.

The defendant International Standard Electric Corporation is a subsidiary of International Telephone and Telegraph Company. It is the assignee of a patent to Gilbert S. Vernam No. 1,895,112 issued January 24, 1933, on an application filed in the U. S. Patent Office on May 12, 1930.

### Statutes

Section 4911 prescribes the procedure for taking appeals from the Board of Appeals of the Patent Office.

Section 4915 provides: "Whenever a patent on application is refused by the Commissioner of Patents, the applicant, unless appeal has been taken from the decision of the board of appeals to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided, in which case no action may be brought under this section, may have remedy by bill in equity, if filed within six months after such refusal; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication and otherwise complying with the requirements of law. * * * In all suits brought hereunder where there are adverse parties the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony. The testimony and exhibits, or parts thereof, of the record in the Patent Office when admitted shall have the same force and effect as if originally taken and produced in the suit."

## Claims Involved

Claims 13, 23, 29 and 32 of the Vernam patent [1] define three inventions relating to teletypewriter exchange systems having a number of printer stations, and a switchboard for interconnecting such stations. These claims are set out in the footnote. All the instrumentalities used in such systems were well known in the prior telephone and telegraph arts. Speaking of the printing telephone art, Vernam testified: "It goes back to the days of Morse, and certainly well before the Civil War. They had various types of printing telegraph machines. One such machine is the stock-ticker which has been in use for many years." Incidentally, it appears that Vernam had a recognized position in the art. He testified: "About 1921, as I have previously stated, I started developing a printer exchange system for the A. T. & T. Company, and at first those were largely theoretical, but within a few years there began to be an active demand for such switchboards, particularly what we call private branch exchange or PBX switchboards, and a considerable number of those were installed during the period of about 1926 to 1929."

The first invention covered by claims 13 and 23 is for a specific improvement in teletypewriter exchange systems. If a connection exists over a link or cord circuit between two subscribers' printer stations and the central operator's printer, and if a second connection is established over a second link circuit between two other subscribers' printer stations, then the first connection must be so arranged by this improvement that it remains closed, and must not be opened if by mistake the central operator attempts to connect her printer with the second link without first disconnecting it from the first link.

The second invention defined in claim 29 is for the specific improvement in such systems whereby if connections are set up between pairs of subscribers over a plurality of cord circuits, then the central office operator must be able to connect her printer to any one of these circuits and to communicate with both subscribers by operating the monitor key associated with the corresponding cord circuit, and by operating the split key she can cut off either of the two subscribers and communicate with the other subscribers without taking down any of the connections.

Both the first and the second inventions are useful only in telegraph switching systems in which a large number of sub-

---

[1] "13. In a telegraph system, the combination of a central station, a toll board, a plurality of toll board link circuits, a toll board operator's printer set, means whereby said printer set can be connected into any one of said link circuits at will and whereby if an attempt is made to connect the printer into two or more link circuits simultaneously, the printer will be connected with only one of said link circuits and means whereby the remaining circuits will be or remain closed."

"23. In a telegraph system, the method of connecting the central station toll board operator's printer set with the toll board link circuits, comprising inserting a monitoring key into each toll board link circuit and so connecting said operator's printer set circuit with said monitoring keys that on the operation of a particular key said printer set will be connected into the link circuit associated with said key and with only one of said link circuits if more than one key be operated, the remaining unconnected link circuits, in such case, being closed."

"29. In a telegraph system, a central station having a switching board and a plurality of link circuits each provided with a pair of terminals, a first and second station adapted to be interconnected through said switching board and the terminals of any one of said link circuits, an operator's printer set common to said link circuits, a monitor key associated with each link circuit for connecting the operator's printer set to both the first and second stations through the terminals of the associated link circuit, and switching means in the printer set circuit for connecting said printer set to either said first or said second station and disconnecting it from the other station without removing the terminals of said link circuit from said switching board by connecting said printer set to either terminal and disconnecting it from the remaining terminal of the link circuit associated with the previously operated monitor key."

"32. In a telegraph system, a central station, a local station connected therewith by a telegraph line, a printer motor at said local station, means under control of said central station for starting and stopping said printer motor, and means under control of said local station for stopping said printer motor but conditioning said local station circuit for the restarting of said printer motor from the central station."

scribers' printers are interconnected over a cord or link circuit.

The third invention covered by claim 32 is for an improvement to enable the central operator to start and stop a subscriber's printer motor. It is not necessary, as far as this invention is concerned, for the subscriber to be able to start his own motor; but he must be able to stop his motor, without the cooperation of the central operator, and yet leave the circuit in such condition that the motor can be restarted by the central operator.

### Patent Office Proceedings

The four claims from the Vernam patent formed the subject matter of a patent office interference. April 4, 1934, plaintiffs copied into the Locke and Kinkead application claims from the Vernam patent including claims 13, 23, 29 and 32 now before the court. August 23, 1934 an interference was declared. Both parties took testimony. The Vernam application was filed May 12, 1930. The Locke and Kinkead application was filed June 7, 1930. Vernam was the first to file an application and was presumed to be the first inventor of the subject matter in issue. The burden fell on Locke and Kinkead to prove that they had made the invention before Vernam. July 10, 1936, the Examiner of Interferences held that Locke and Kinkead had not proved priority. June 30, 1937, the Board of Appeals affirmed the Examiner of Interferences in every respect.

The Examiner of Interferences and the Board of Appeals of the Patent Office both awarded priority to Vernam and held that Locke and Kinkead had failed to prove by a fair preponderance of evidence that they had completed the three inventions prior to the filing date of the Vernam patent, May 12, 1930, or that they were continuously diligent from the date when Vernam entered the field until the filing of the Locke and Kinkead application.

### Plaintiffs' "Reduction to Practice"

Plaintiffs sought to prove completion of the invention by a reduction to practice in March, 1930. The apparatus used in the demonstration and the drawings from which the apparatus was built, assembled and wired were not produced in the patent office or in this proceeding. In the patent office plaintiffs sought to escape the lack of contemporaneous documentary evidence by the testimony of Locke, Kinkead and Singer that the demonstration equipment was wired in accordance with the drawings of the Locke and Kinkead application. They also testified that agenda, exhibit 10, listed all the operations performed at the demonstration. Both tribunals of the patent office held that the testimony and proof failed to establish that the demonstration equipment embodied the inventions.

In this court plaintiff sought to prove a reduction to practice in substantially the same manner. The original equipment and drawings are still missing. We again have the testimony of Locke, Kinkead and Singer and others that the demonstration equipment was wired as shown in a set of blueprints from which the patent office drawings were made. In the patent office one copy and in this court another copy of the same drawings are used. There is nothing "new" about the drawings upon which plaintiffs now rely. They are no more contemporaneous documentary evidence than were those used in the patent office interference.

Agenda, exhibit 10, describes the functions of the system in very broad terms and says nothing about the specific functions of the claims in controversy. The exhibit describes 100 or more different operations but fails to describe a single function which would throw light on the combinations defined in the claims. Respecting this agenda Locke testified: "We noted down in this agenda all the different functions of the switchboard and to those who came to see this demonstration we went over each item indicating as we went along what was happening, and referred them to the item on this agenda sheet of which they were given a copy." Brown testified: "At this demonstration there was an agenda sheet, I should say several sheets comprising an agenda, setting forth in great detail the functions and the operation of the various specific circuits which went to make up this switchboard. I recall distinctly watching Mr. Locke and Mr. Kinkead follow through this agenda sheet line by line from the very initiation of a subscriber's call clear through to the completion of the call." Catogge testified: "Exhibit 10 shows the agenda sheet which was used for demonstrating this board, and it also is a list, which gives out the various functions of this board which were demonstrated by Locke and Kinkead on various occasions." Bell testified: "Exhibit 10 is a copy of the agenda which

was prepared to be used when the demonstrations of the operation of this switchboard were made."

The only purpose of this testimony was to induce the court to believe that the agenda described the inventions in issue. A careful reading of the agenda fails to describe a single function that would throw light on the presence or absence in the demonstration equipment of the combinations defined in the claims.

The claims are narrow as was explained in the opening statement of defendant:

"All the claims involved in this controversy are extremely limited. They are not claims broadly for a telegraph switching system. Telegraph switching systems have been old and have been in use for many years. This patent contains very specific claims on the specific arrangement of the wires in this system.

"Whether or not the invention is present or absent depends on whether a wire is connected to one contact of a key or to another contact of a key. * * * This patent deals only with the wiring that is concealed; the wiring that is built in the things covered up in this equipment, the features that no one looking at the equipment could possibly notice."

It should be noted that plaintiffs fail to ask the court for any specific findings as to the agenda, exhibit 10, although specific findings of fact are proposed for many of the other exhibits. There is no answer to the following testimony of Vernam:

"Q. 69. Will you now refer to Plaintiff's Exhibit 10 which is the agenda that witnesses have testified was used during the March, 1930 demonstration of Locke-Kinkead switchboard, and which, as I understand it, describes the operations that were performed in the course of the various demonstrations that took place in February, March and April, 1930. You have studied this memorandum in the interference in the Patent Office as well as during this trial, have you not? A. I have.

"Q. 70. Does this memorandum describe any functions or operations characteristic or appertaining to the three inventions in which we are interested in this case? A. It does not.

"Q. 71. Assuming that all the operations and functions described in this memorandum were in fact performed in February and March and April, 1930, in your opinion did or did not these demonstrations show the operation of inventions 1, 2 and 3? A. They did not."

Locke and Catogge testified that the demonstration equipment was wired from drawings which are no longer in existence and by men who can not now be located. It is strange that a large concern which maintains extensive records and preserves hundreds of drawings admittedly inoperative failed to preserve any record of the details of this extremely important demonstration to which hundreds of people were invited. It is admitted that changes were made after the demonstration and that the first commercial installation had to wait for almost two years after this alleged successful demonstration of the inventions.

The first and second inventions could not have been reduced to practice in the March, 1930, demonstration equipment because that equipment contained only two subscribers' printers stations. Vernam testified:

"* * * for a real demonstration it would be necessary to have more than two stations. We should have four station printers connected through at least two cord circuits, in order to demonstrate completely these two inventions; in fact, for the monitoring key arrangement, for a complete demonstration, we should have even more than two cord circuits, because the operator might have eight or ten cord circuits, and, for example, leave the monitoring key on circuit No. 10 operated, and then accidentally insert a call and throw the monitoring key of cord circuit No. 1. The short circuit established through the cord circuit No. 1 must extend through all the intermediate keys in order to close the cord circuit of key circuit No. 10.

"Q. 67. And, as I understand it, the first and second inventions were intended to take care of just such emergencies? A. That is right."

Actual reduction to practice must produce something of practical use. It must demonstrate by actual trial that the thing will work for the intended purpose. It is the date of the actual test of the machine which determines the date of reduction to practice. The first and second inventions have no utility except in systems in which many connections are simultaneously established. The 1930 equipment may have been used to dem-

onstrate other inventions. It had only two subscribers' stations and could not have been used to demonstrate the practicability of these inventions.

### Plaintiffs' Diligence

Plaintiffs seek to establish priority in this proceeding, as well as in the patent office on the alternative theory of prior conception and continuous diligence. The patent office tribunals held against plaintiffs on this theory also.

Vernam's dates of conception are July 25, 1929, for the first and second inventions and August 5, 1929, for the third invention. These dates are conceded in plaintiffs' proposed findings of fact.

Locke and Kinkeads' dates of conception are alleged to be June 14, 1929, for the first and second inventions; also on July 29, 1929, and on October 11, 1929, for the first and second inventions; and for the third invention on August 9, 1929, September 4, 1929, September 30, 1929, and November 29, 1929. None of these later dates will avail Locke and Kinkead because they are subsequent to Vernam's conceded date of conception.

The subsequent dates are necessary for plaintiffs' case because plaintiffs' early drawings of June and July, 1929, were desultory sketches and were abandoned. As late as October, 1929, Locke and Kinkead made up a cardboard model of a switchboard completely unwired and incapable of demonstrating the inventions. If at that time they had a satisfactory operative circuit this model would have been wired. Equipment to demonstrate the inventions was available in the laboratory. That equipment consisted of the usual telephone relays and switchboard.

That the June and July drawings were not satisfactory is indicated in Locke's diary under date of August 27, 1929, to the effect that a 30 line board set up in the laboratory was nearing completion. In September, 1929, the type of motor control arrangement was still being discussed. Locke and Kinkead were debating the ultimate functions of the circuits. On September 24, 1929, Kinkead believed they had circuits by means of which some kind of inventions could be tested but his associates did not agree with him. It is clear that if all of this newly discovered evidence had been before the patent office, that office would have held plaintiffs' June and July drawings to be mere attempts which were later abandoned.

From September, 1929 until March, 1930 Locke did not wait for relays or other equipment. He used in the demonstration equipment the relays on hand. The invention had to do solely with the manner in which old relays and equipment were connected with one another.

Plaintiff argues that Locke & Kinkead were diligent between July, 1929, when Vernam conceived the inventions and, March or June, 1930 because during that period they prepared a large number of drawings relating to printing telegraphy and made preparations for all kinds of demonstrations. This avalanche of drawings had nothing to do with the invention; they merely prove that the Bell Telephone Laboratories was engaged in work on printing telegraphy.

The making of drawings is not "diligence". There is no evidence that any of these drawings were used or could be used in the reduction to practice of the invention. In fact, the reduction to practice should have taken place in June or July, 1929 when Locke and Kinkead are alleged to have made their invention. Plaintiffs had apparatus on hand to effect such reduction to practice. The "newly discovered evidence" does not contain any contemporaneous documentary evidence of the alleged reduction to practice. The documentary evidence before this court is identical with the evidence that was before the tribunals of the patent office.

The new exhibits have to do only with plaintiffs' alleged diligence. Exhibits 19–A to 19–Z$_1$ have nothing whatever to do with the inventions. There is nothing that connects them with exhibit 3. Between April 16, 1929 and September 3, 1929, the date of exhibit 19–Z$_1$ Locke and Kinkead were drawing up a couple of dozen printing telegraph switching circuits which had nothing to do with the invention. Exhibits 20 to 20–G are sketches of circuits that Locke and Kinkead thought up in September 1929 except exhibit 20–A which is a copy of exhibit 4. It is not alleged that they were reduced to practice. Assuming that exhibit 20–E describes the three inventions (which it does not), it shows that several months after Vernam's date of conception plaintiffs' employees were still working in the experimental stage. The exhibits in the 20 series throw no additional light on the demonstration. Exhibit 21 is merely a duplicate of exhibit 7 and adds nothing to

what was before the patent office. Exhibits in the volume containing the 22 and 23 series are merely copies of exhibit 21 and therefore of exhibits 7 and 8. They are the ones from which the patent office drawings were prepared. The testimony of the witnesses that the demonstration equipment was wired in the manner illustrated in these drawings is the same kind of evidence as was before the patent office. It was not alleged that these drawings were used in the wiring and installation of the demonstration equipment. The 24 series of exhibits are the requests for relays and special equipment which were never used in the demonstration equipment. Exhibits 26 are Brown's diary notes, a copy of Locke and Kinkead application, and photographs of the exhibits used in the court room. Exhibit 27 is a memorandum dated July 27, 1929, which plaintiffs argue "required" the presence of the invention. This exhibit merely shows what plaintiffs' employees wanted to get. It does not show when those requirements were fulfilled. Portions of this exhibit were read into the interference record. It contains no evidence not before the patent office bearing on reduction to practice and diligence.

The evidence presented before the tribunals of the patent office and before this court contain no substantial differences. There is certainly nothing in this new evidence of sufficient weight to overcome the findings of the tribunals of the patent office.

All the new evidence was within plaintiffs' possession and control during the interference proceedings. Locke's testimony suggests that this new evidence was partly unavailable and partly unappreciated during the interference and that the papers were recently found in an unexpected place. No excuse is presented for the failure to produce during the interference the Brown exhibits (series 22 and 23) or the orders for relays (series 24). All the other newly discovered exhibits were found in one big red envelope in Kinkead's filing cabinet. The envelope and the numerous other papers contained therein were not produced. The only inference that can be drawn from this failure to produce the envelope and the contents thereof is that they were damaging to plaintiffs' case. The drawings were in Kinkead's file and were desultory, inoperative and abandoned sketches. None of this newly discovered evidence adds anything of substance to the record before the patent office.

## Law

In the present case the interference was between a pending application and an issued patent. The Vernam patent is presumptively valid. Vernam is presumptively the first inventor of the invention defined in the claims in controversy. Both tribunals of the patent office held that Locke and Kinkead had not sustained the burden of proof resting upon them.

"For the grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent, and of its novelty. Smith v. [Goodyear Dental] Vulcanite Co., 93 U.S. 486 [23 L.Ed. 952]; Lehnbeuter v. Holthaus, 105 U.S. 94, [26 L. Ed. 939]. Not only is the burden of proof to make good this defense upon the party setting it up, but it has been held that 'every reasonable doubt should be resolved against him.'" Morgan v. Daniels, 153 U.S. 120, 123, 14 S.Ct. 772, 773, 38 L.Ed. 657.

The record in this court is no stronger than the record that was before the patent office. The findings of the patent office should be followed by this court unless the contrary is established by testimony which in character and amount carries thorough conviction.

"But this is something more than a mere appeal. It is an application to the court to set aside the action of one of the executive departments of the government. The one charged with the administration of the patent system had finished its investigations and made its determination with respect to the question of priority of invention. That determination gave to the defendant the exclusive rights of a patentee. A new proceeding is instituted in the courts,—a proceeding to set aside the conclusions reached by the administrative department, and to give to the plaintiff the rights there awarded to the defendant. It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence. Butler v. Shaw, [C.C.], 21 F. 321, 327. It is a controversy between two individuals over a question of fact which has once been settled by a special tribunal, intrusted with full power in the premises. As such it

might be well argued, were it not for the terms of this statute, that the decision of the patent office was a finality upon every matter of fact. * * *

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction." Morgan v. Daniels, 153 U.S. 120, 124, 125, 14 S.Ct. 772, 38 L.Ed. 657.

The 1927 amendment to Section 4915, R.S., 44 Stat. 1336, § 11, 35 U.S.C.A. § 63 in no way affected the rule of Morgan v. Daniels. Cases decided after the enactment of the amendment specifically follow the rule of Morgan v. Daniels though the decisions do not refer specifically to the amendment. Powell v. McNamara, 2 Cir., 74 F.2d 750; Bayer v. Rice, 64 App. D.C. 107, 75 F.2d 238.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The bill of complaint must be dismissed.