NEILL et al. v. KINNEY.

(Circuit Court of Appeals, Third Circuit. January 25, 1917.)

No. 2167.

1. PATENTS ☞26(2)—INVENTION—COMBINATION OF OLD ELEMENTS.
   In looking for invention in a combination of old elements, the court is guided by the new and useful means which the combination may afford, or the new and useful results which may be obtained from it.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27, 30.]

2. PATENTS ☞328—VALIDITY AND INFRINGEMENT—OIL WELL DERRICK.
   The Neill patent, No. 933,386, for an oil well derrick of tubular metal, while not generic and for a combination of old elements, in view of its novel and useful qualities of simplicity, portability, durability, and economy, all of which have been recognized in the art in a marked degree, discloses patentable invention; also *held* infringed.

3. PATENTS ☞35—INVENTION—UTILITY OF DEVICE.
   While a mere summation of points of merit does not constitute invention, their presence in a markedly increased measure cannot be overlooked in estimating the utility of a device, and in determining whether it produces new and useful results, within the principle upon which patents are granted.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 39.]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Thomas A. Neill and Lee C. Moore & Co. against Frank Kinney. Decree for defendant, and complainants appeal. Reversed.

Frederick W. Winter, of Pittsburgh, Pa., for appellants.

Kay, Totten & Powell, of Pittsburgh, Pa. (Robert D. Totten, of Pittsburgh, Pa., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is an action for infringement of Letters Patent No. 933,386, for an oil well derrick. Claim 1, being the only claim in issue, was held invalid by the District Court for want of patentable invention. The case comes before us on this single issue, infringement being found if the patent is valid. The claim fairly describes the invention, and is for a combination containing the elements we have numbered. It is as follows:

"1. A metal oil well derrick or tower, comprising (1) tubular leg sections, (2) clamping sockets uniting the ends of adjacent leg sections and (3) provided with two sets of perforated ears or flanges located substantially 90 degrees apart and each providing three perforations arranged in vertical rela-

tion to each other, and (4) tubular girts and braces provided with flattened perforated ends, (5) a girt being bolted to the intermediate perforation in each set of the ears or flanges, and (6) a brace bolted to the upper and lower perforations of each set of ears or flanges."

All these elements (with the possible exception of the one numbered 3) are old in the art. We are therefore confronted with the question whether this claim presents a combination involving invention or is a mere aggregation of old elements skilfully arranged.

Drilling rigs, used in the drilling of oil wells, have made a great advance from a primitive beginning. Into an art highly developed and conspicuous for the resourcefulness of its operatives the patentee entered, and in combining what was already there, he raises a very close question as to whether the structure of his patent is the product of his own mind or of the minds of others, and whether he has made a contribution to the art so original and substantial as to amount to a step in advance, for which he is entitled to the reward of a patent. The determination of this question has required a consideration of the art, its problems and accomplishments, to an extent not disclosed by the very brief outline that follows.

Exploration for petroleum and natural gas has always been conducted by drilling bore holes. In drilling bore holes there are two fundamental operations—drilling and hoisting—and the character of these operations, considered with reference to the purpose for which they are conducted, the region of the undertaking, geological conditions, economy of construction and of operation and maintenance after completion, determines the character of drilling mechanism and structures.

The record date of the art of drilling wells is January 15, 1808, and the original rig, used in drilling for salt, was known as the Spring Pole and Tripod. This rig consisted simply of a wooden walking beam or spring pole mounted on a forked stick, suggestive of an old-fashioned well-sweep, with its stationary end weighted by a stone. To the upper or spring end of the pole was attached a rope, and to the lower end of the rope was connected a crude drilling instrument. This was lowered into tubing consisting of two strips of wood whittled in half tubes and wrapped with twine. The operation was performed by manually springing the elastic pole up and down, causing the tool at the end of the rope to descend with force, ascend and descend again. Here was a combination of drilling mechanism and drilling structure, and, primitive as it was, it contained the essential features of all subsequent development in deep well drilling, and was adopted as the best the art afforded when the oil and gas industry started with a rush in 1859.

The spring pole and tripod principle, in which the structure and means of operation are inseparably combined, was pursued with varied modifications for years, until in the evolution of the art, drilling mechanism became a thing apart from the supporting and hoisting structure which carried it, and the two became separate arts, or certainly distinct branches of the same art. We are concerned in this suit not with drilling mechanism in the sense of power and means of applying it, but with structures in which the drilling means is housed and the drilling operation conducted.

Considered with respect to its characteristic as a structure, the spring pole and tripod was followed by the square-rigged braced wooden derrick or hoisting tower of familiar appearance. The very early oil well derricks of this type were made of poles cut from nearby forests and crudely framed together. Their subsequent modification was brought about by the requirement for increased strength and height, and consisted chiefly in a change from rough timbers put together by inexperienced hands to sawed lumber framed by skilled carpenters. These derricks were high and narrow, and stood upon comparatively narrow bases. They were subjected to severe lateral strain from wind and to a compression strain that in certain operations of hoisting was tremendous. While the problem of meeting these strains was in a measure solved by triangularly stiffening the structure with braces and girts, the problem of wind strain had not been completely solved at the time of the invention in suit, but had indeed been somewhat intensified by the substitution of planks for bare timber poles.

The first derricks were made of wood, because of the abundant supply and low cost of material when operating in wooded districts. But operations were at times conducted where wood was not at hand and was to be had only at high cost. The advantage of cheap material for wooden derricks was offset by the high cost of skilled labor required in constructing them and by the very considerable loss of lumber in taking them down by the customary method of toppling them over. Wooden derricks were also liable to destruction by fire, and in regions of large operations were blown down by hundreds in heavy windstorms.

The uncertainty of oil flow and the movement of operations from one field to another made economy in the construction, removal, and new construction, a factor in the industry; hence inventors turned their thoughts to the art and invented derricks of many types, seeking always a structure made of cheap, strong and durable material, adapted to be moved from place to place and to be used in timberless regions, and so designed as to permit the ready assembling and disassembling of parts at low cost and with little damage. Thus portable and semiportable drilling rigs came into use. But it was soon found that portable rigs could not economically be made of wood because of its destructibility, so different types of metal and semi-metal derricks came into the field, each bringing its own peculiar merits and defects.

The first metal derricks were of structural steel in angle iron parts. Their advantage over wood consisted in saving the whole structure upon removal; but their disadvantage lay in their weight and in their greater material and labor cost. They were in a sense vertically erected bridges and only men somewhat skilled in the art of bridge-building could erect them.

The next step in metal derricks was in pipe or tubular construction, the particular field of the patent in suit. Pipe construction had advantages over angle iron construction, but its peculiar defect was weakness at the joints at which the leg sections or uprights met and from which the girts and braces radiated. The joints held a real problem. This problem was attacked by all patentees whose inventions are cited as

anticipations to the patent in suit, and it may safely be said was solved by none of them.

These patents were offered to show the state of the prior art, and were all the testimony produced by the defendant. From these patents, a very brief analysis of which is given in the margin,[1] it is fair to say that Neill, the patentee, may have gotten the most of his ideas. He may have gotten from Snow (No. 493,660) the idea of a metal derrick, and from Shannon (No. 876,243), Hyde (No. 331,714) and Gates (No. 411,432) the idea of a tubular metal derrick. Wilson (No. 566,364) and Caldwell (No. 487,902) may have suggested a socket without a clamp, and Bullock (No. 407,993) a socket with a clamp, and all excepting Snow may have shown the uses of girts, braces and sectional legs. While the disclosures of these prior patents may in one way or another have contributed elemental ideas to Neill's complete concep-

[1] The Shannon Patent, No. 876,243, the only tubular metal derrick designed for oil well use which appears actually to have been used, has the fatal defect of threaded leg joints, causing the legs to break where the threads cut the pipe, and also a structural weakness in bolting a pair of braces to each girt and the two girts to the same joint, so that if the joint bolt breaks, the whole corner falls.

In the Hyde Patent, No. 331,714, there are neither clamps nor sockets. The leg sections are joined by a threaded union, and are encircled by the eye of the girts and braces at the joint. There is no testimony that derricks of this construction were ever used.

In the Wilson Patent, No. 566,364, there is a joint socket (not a *clamp* joint socket) in which the leg sections rest loosely. The girts are connected with the socket by threads, the braces by bolts. There is a resemblance in the mechanism of this structure to that of the patent in suit in the vertical arrangement of the three parts for joining braces and girts.

The Snow Patent, No. 493,660, shows a tower for windmills made of angle iron. This construction does not show sectional upright members and therefore does not present the problem of joints and the necessity for clamp joint sockets, the essence of the patent in suit.

The Caldwell Patent, No. 487,902, does not disclose means for clamping sections of upright posts. In this construction, the posts merely fit into shallow tubular sockets to which braces are attached, and are adjusted by turn buckles. There is no evidence that this device was ever used.

The Gates Patent, No. 411,432, shows an iron tower for tanks, in which the corner posts are pipes of one piece from bottom to top, but says that the posts may be made of sections and be joined together by ordinary threaded coupling, a thing shown by the testimony in this case to be entirely impracticable for oil well use. No problem of coupling is suggested or solved in this patent.

The Bullock Patent, No. 407,993, shows a slotted sleeve for connecting tubular sections. It is a socket, in fact a clamp joint socket, but its arrangement is such that the leg sections enter the socket but a slight distance and are kept from contact by a space through which a tie-rod holding the girt is carried to the other side and bolted. The one similarity of this socket to the socket of the patent is that it is a clamp joint socket, but it is so different in structure and function that it cannot be considered to have solved the problem of joining sectional uprights and horizontal and diagonal girts and braces in one grip.

The Hyde Patent, No. 338,668, shows a method of forming an eye in the end of a tubular member. The flattening of a tube end and forming it into an eye is old in the art and is one of the old things which the patentee of the patent in suit appropriated. In doing so, he did not impinge upon whatever invention Hyde may have made. These are all the patents cited.

tion, they do not when aggregated disclose the Neill structure, nor did they suggest to others the possibility of his subsequent combination. It is not possible to combine any two of their elements and produce his structure, nor is it possible to produce it by combining all, unless they be substantially modified, and a new element of "two sets of perforated ears or flanges located substantially 90 degrees apart and each set providing three perforations arranged in vertical relation to each other" for girt and brace attachment, be added. Though elements of prior art patents are separately found in modified form in the Neill structure, these elements as combined by Neill resemble nothing before combined in the art, and, in our opinion, do not constitute anticipations of the Neill patent.

Though not invalid because anticipated by the art from which its elements were taken, we approach the question whether the patent is invalid for lack of invention in combining those elements. The Patent Office found and the District Court denied invention upon precisely the same patent references. As these opposite findings raise a doubt as to invention, we address our inquiry to those considerations which the courts have said turn the scale in such cases. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952.

The District Court held the patent invalid upon its finding that the claim of the patent does not disclose a single element not found in the prior art, and that the combination of elements does not produce a new or better result than other derricks in the art, with the possible exception of greater durability.

[1, 2] In looking for invention in a combination of old elements, we are guided by the new and useful means which the combination may afford or the new and useful results which may be obtained from it. The novelty and utility of the patent, both in means and results, are so closely related in the testimony that we shall consider them together. There is no question that the old elements of the patent, when combined, make a new structure; nor is there question that they produce new results. The question is whether the novelty of structure is patentable novelty, in that new results are produced by employing old means in a new way. It is difficult to find invention in the structure from new functions separately performed by the old elements, because alone each performs very much its old function, but collectively they perform a new function by producing new and better results than before produced either separately or in combination. Therefore, the patentable novelty of the invention must be determined not alone by the novelty of its means, which includes marked simplicity of construction and the solution of the problem of weak joints in tubular derricks, but by the number and measure of its new uses and improved results, the principal of which are simplicity and economy in construction, operation and transportation, all promptly recognized and extensively adopted by the art.

The derrick of the patent is singularly simple. It is excelled in that regard by no other derrick shown in the testimony. Its simplicity is its chief claim to excellence, though it was its undoing in the court below. In design it is simpler than a child's Meccano, and in assem-

bling and putting together its parts, less thought is required than in putting together that toy. The parts are so formed in shape and size that they fit only their proper places and cannot be put together wrong. In this respect they are fool-proof. They may be assorted and put in place entirely by unskilled labor with the aid of no other tool than a wrench. The sections are so arranged in dimension that as the structure rises it may be used as its own scaffolding. The clamp sockets fit only the places intended for them, and to the clamp sockets are connected the girts and braces in the only places in which they can be fastened, the tension of all parts being estimated and perfected in the shop, thereby dispensing with mechanical adjustment or manipulation in the field. The structure may be disassembled as readily as assembled, again acting as its own scaffolding. It may be transported at lower cost because of its lesser weight and without the damage usual to threaded and delicate parts of other metal designs.

The derrick of the patent, though lighter, is stronger than any shown in the art, and though not presenting the first clamp joint socket, it employs one that disposes of the problem of weak joints in tubular structures. The structure is more durable in service and transportation, thereby appreciably reducing loss by damage and decreasing cost of labor in those operations, which have always been important economical considerations in the use of derricks. With the derrick of the patent it is testified that the only loss customarily occurring is the loss of nuts and bolts. The saving in labor cost is effected and measured by the substitution of common labor for skilled labor. While its original cost is greater than that of a wooden derrick, yet because of its durability and economy in handling, its cost is less in the end. Its capacity to stand lateral wind pressure is an important element of economy, one witness testifying that out of 1,000 wooden rigs he had seen as many as 200 blown down in one storm, while he had never had a Neill derrick blown down.

Its novelty and utility in structure and results have commanded a prompt and extensive recognition by the art, one witness testifying that his oil company abandoned the use of all wooden and steel derricks when the Neill derrick appeared, and now uses 3,000 of them. Another witness stated that the other steel derricks he had seen in use were about one per cent. of the number of Neill derricks. Another testified that his oil company had in use seven or eight angle iron derricks and five or six hundred Neill derricks. Rig-builders testified to the rapidly growing and expanding use of the Neill derricks over other metal derricks; and the licensee showed that it had furnished approximately 165,000 clamps (the central element of the patent) for use upon Neill derricks in all the oil states of the country, except California, and that it had sold derricks to 200 customers widely distributed in East Indies, Russia, Austria, Galicia, Roumania, Trinidad and British Guinea.

[3] While the derrick of the patent, in view of its position in the art, is not a pioneer, and while it is not a great invention, yet it has in combination in a novel and useful way the qualities of simplicity, portability, durability and economy. We are of course aware that a mere summation of points of merit does not constitute invention any more than

a mere aggregation of elements. Yet their presence in a markedly increased measure cannot be overlooked in estimating the utility of a device and in determining whether it produces new and useful results within the principle upon which patents are granted. These qualities do not separately appear to the same extent in any derrick shown to have existed before, and are not collectively found in any derrick at all. The recognition by the art of its new means and results, and the fact that the structure of the patent has largely replaced many structures of other designs, constitute persuasive evidence of invention and are proper matters to be put in the scale when invention is in doubt. Minerals Separation Co. v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. —; Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 429, 430, 22 Sup. Ct. 698, 46 L. Ed. 968; The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952.

We are of opinion that invention is shown and that the first claim of the patent is valid.

Although the patentee has not made a generic invention, he has nevertheless made a distinct advance in the art, for which within its scope he is entitled to protection from infringement. We are of opinion that the structure of the defendant clearly infringes the first claim of the patent in suit, and therefore direct that

The decree below be reversed.