**KASSER EGG PROCESS CO. v. POULTRY PRODUCERS OF CENTRAL CALIFORNIA.**

**No. 6304.**

Circuit Court of Appeals, Ninth Circuit.

May 8, 1931.

Chas. M. Fryer and Alfred C. Aurich, both of San Francisco, Cal., for appellant.

John H. Miller, A. W. Boyken, and Milton D. Sapiro, all of San Francisco, Cal., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

Appellant brought this action for infringement of two patents issued to Samuel F. Henderson, No. 1,174,008, issued February 29, 1916, for the art of preserving eggs by the application of a colorless, odorless, tasteless, nonvolatile mineral oil to the shell of the egg, and patent No. 1,177,105, issued to him for the art of preserving and sterilizing eggs. Appellant states: "Both patents relate to and cover methods for preserving eggs by treating them with petrolatum. In addition, the first patent also covers, as a new product or article of manufacture, an egg treated according to the methods covered by said patents."

We quote as briefly as may be from the specifications and claims of the first patent involved in this action:.

"The invention may be stated as comprehending primarily the application of an odorless, colorless and tasteless substance, in the form of a liquid, to the shell of an egg, as distinguished from a substance which leaves an objectionable coating on the shell.

"The invention also comprehends the application of a substance to the shell of an egg which is characterized as having the quality of rapid penetration of the shell of the egg, with a view of preventing the ingress or passage of moisture to or from the egg and also for preventing the passage of destructive bacteria into the eggs through the shell.

"A freshly laid egg has a coating of gelatinous substance, which is commonly known as 'bloom.' It is recognized that this substance has a preserving tendency, but is soon dissipated or destroyed when exposed to the atmosphere. The present invention includes also adding to the egg shell a substance which will, in many respects, resemble both in effect and in appearance the aforementioned natural bloom.

"The material with which I treat the eggs and which I have discovered can be used with great success for the purposes above stated, is what is known as 'liquid petrolatum.' This substance or material is, according to my best and present information, a mixture of hydrocarbons, chiefly of the methane group, obtained by distilling off the larger part of the lighter and more volatile portions of petroleum, the residue being purified so that the remaining substance is substantially colorless, oily, transparent, without odor or taste, and does not congeal or form a paste or waxy coating when applied or exposed.
* * *

"It may be noted also that the material liquid petrolatum, 'petroleum liquidum', possesses the characteristics of being uninjurious to the human system, and being an oil, is moisture repellant.

"Eggs treated with liquid petrolatum, either at a normal temperature or at a highly heated temperature possess general characteristics which will preserve the egg and render the shell moisture repellent and germ proof. It does not impair the egg in any material respect, the moisture of the contents of the egg being prevented from escaping through the oil treated shell. * * *

"The material 'liquid petrolatum' or its equivalent I have found represents a very satisfactory and successful artificial bloom, the natural bloom being recognized as an important preservative for the egg for a very short duration of time. In this particular it may also be observed that the material being of an oily character gives a 'bloomy' appearance to the shell so that the egg has the appearance of freshly laid and this is maintained until the egg is used. * * *

"While I have found liquid petrolatum is very successful for the purposes specified, I wish it understood that other light oils, if possessing the same or general characteristics of liquid petrolatum, may be employed without departing from the invention, and I do not wish my patent protection to be limited to the specific material. I believe, however, I am the first to ever discover that by treat-

ing an egg with a substance having the characteristic above outlined, a very beneficial and useful result is obtained and therefore I do not wish to be limited to the specific material.

"Having thus described the invention, what is claimed is:

"1. The method of preserving eggs consisting in treating the shells thereof with a substance consisting of a mixture of hydrocarbons, chiefly of the methane series, obtained by distilling off most of the lighter and more volatile portions from petroleum, purifying the residue so that the remaining substance is substantially colorless, oily, transparent, is without odor or taste, and not readily evaporable.

"2. The method of preserving eggs consisting in treating the entire shell thereof with liquid petrolatum.

"3. The method of treating eggs consisting in subjecting the eggs to a bath of liquid petrolatum, removing the eggs from the bath and permitting the surplus to flow from the shell.

"4. The method of preserving eggs consisting in treating the shell thereof with a substance having substantially the characteristics of liquid petrolatum.

"5. The method of treating eggs for preserving purposes consisting in applying to the shell of the egg throughout, a substantially colorless, tasteless, transparent, nonvolatile mineral oil.

"6. An egg having its shell treated with liquid petrolatum.

"7. An egg having its shell treated with an oil which possesses substantially the characteristics of liquid petrolatum.

"8. An egg having its shell treated with a hydro-carbon oil which possesses the characteristics of liquid petrolatum.

"9. A method of preserving eggs consisting in coating the shell thereof with liquid petrolatum.

"10. The method of producing an artificial bloom for egg shells consisting in applying to the shell liquid petrolatum."

The second patent (No. 1,177,105) is for an improvement on the first, by applying the oil when heated. The specifications of the second patent largely duplicate the first with certain additions, a portion of which we quote as follows:

"In carrying out the method, the eggs in quantities if desirable, may be placed in a wire basket or other reticulated carrier, immersed in a bath of liquid petrolatum. Conveniently the liquid may be heated to a temperature from 210 to 225 degrees, more or less, with a view of destroying by the heat the living destructive bacteria, while at the same time applying the preservative to the shell. The eggs are allowed to stand in the bath for a short period of time, which will differ according to the temperature of the liquid. Under the above high temperatures it has been ascertained that five seconds is ample time. A longer period by a few seconds may be required for treating the eggs at a lower temperature of the liquid. The eggs are removed from the bath after treatment and placed on any convenient form of drain table and the surplus liquid permitted to pass from the shell. In this condition the eggs are ready for storage or the market.
* * *

"Having thus described the invention, what I claim and desire to secure by Letters Patent is:

"1. The method of preserving eggs consisting in dipping the eggs into a heated liquid oil substantially odorless, substantially colorless, non-volatile and non-drying.

"2. The method of preserving eggs consisting in introducing the egg into a body of heated liquid petrolatum."

The trial court held both these patents void for want of invention. As the record is somewhat voluminous, consisting of 456 pages of briefs, transcripts, and exhibits, we can perhaps best state appellant's position in this appeal by quoting from its brief as follows:

"Henderson filed the application for his first patent on August 28, 1915. At that time he realized that efforts had been made to discover a satisfactory way to preserve eggs.

"In his specification he states:

" 'It has been appreciated heretofore that were it possible to so treat a fresh egg that it could be preserved in its natural condition substantially with a maintained natural color, taste and bulk, it would be a highly desirable and important discovery. I believe I have discovered a method and material for effecting this desirable result in a satisfactory manner.'

"He then goes on to point out the various objections which had come to his notice in connection with the prior efforts to preserve eggs. In this connection, he states:

" 'Some of the materials and methods employed affect the taste of the eggs, discolor

the shell, leave objectionable deposits on the shells, and in other particulars have been found to be unsatisfactory.'

"Again he points out that the material to be employed must not 'congeal or form a paste or waxy coating when applied or exposed.' For this reason he says that it is not practical· to use a 'waxy material, such as paraffin.' He also states that 'paraffin oil' is unsuited to the accomplishment of his object.

"The patentee then goes on to say that he has discovered that a liquid hydro-carbon, having certain characteristics, if applied to the shell of an egg, will accomplish the result sought and solve the problem which prior efforts had failed to solve. In identifying this particular hydro-carbon, he was careful not merely to call it by name. He was evidently aware of the fact that in the then development of the petroleum industry the mere name of a hydro-carbon was an unsafe criterion by which to identify such product. He, therefore, very carefully, in his specification and in his claims, pointed out that the hydro-carbon in question was one which was substantially colorless, oily, transparent, without odor or taste, and not readily volatilizable. The absence of color, odor and taste was essential in order to preserve the characteristics of the egg necessary to its edibility. The oily, non-volatile properties were essential to provide a protection for the egg, which would not dry or become sticky or gummy, or deposit a coating, but would retain its original condition for a long period of time. In other words, his process not only had to leave the eggs unaffected as far as characteristics essential to edibility were concerned, but moreover had to preserve, as nearly as possible, the natural appearance of 'bloom' of the egg in order to increase its salability and market value.

"In his specification, the patentee stated that the particular hydro-carbon which he had discovered, would overcome the long unsolved problem, was named 'liquid petrolatum,' but he promptly proceeded to enumerate and particularly point out the above properties of this material in order not to leave any uncertainty as to the characteristics which he had discovered were essential. The patentee further states that in applying the oil to the egg, the temperature may be raised to advantage. This additional idea or step of the invention, although disclosed in Henderson's application filed August 28, 1915, was not claimed by him in that application.. He preferred to claim this specific aspect of his invention in a co-pending application filed by him January 21, 1916, over a month prior to the issuance of the patent on his first application. It was upon this co-pending application that the second patent in suit, No. 1,177,105, was issued, and it is quite similar to the application and specification of the first patent. The only difference is that in the second patent the claims are directed to the use of heated, odorless, colorless, non-volatile, non-drying mineral oil, or petrolatum, whereas the use of heat is not included in the claims of the first patent. This was fully authorized under the law: It was optional with Henderson to include in either of his two co-pending applications the claims specifying the use of heat.

"An examination of the prior art to be considered later, shows that Henderson was the first to discover and apply certain fundamental propositions which made his inventions a real advance in the art and made them successful, practical contributions to the sum of human knowledge, where all prior efforts along the same lines had failed. Not one of the patentees of the prior art, all of whom we must presume, under the law, were more than merely skilled in their art, and were in fact persons possessing the best inventive genius, was capable of making or did make the discovery which Henderson made. Not one of them had the flash of genius which enabled Henderson to. teach to the world that the desired object could be accomplished merely by the. application to the egg of a single, simple, colorless and tasteless substance, without the employment of any other steps or ingredients.

"Each and all of the inventors in the prior art deemed it essential to their respective attempts to solve the problem, to include something more than this. Most of them tried to accomplish the desired result by using compounds of numerous and various ingredients. Many of them resorted to chemical reactions. Some found it essential to employ a vacuum. One even went to the ludicrous extent of insisting that the problem could only be solved by treating the egg almost in the process of being laid, so that a preservative could be applied while the egg retained its original animal heat and other newly laid conditions. Further, every one of these prior inventors employed one substance or another which was destructive to the objects sought to be accomplished, and left the egg with either an odor, color or taste, or an undesirable layer of material on the shell. In fine, not one of them was able to discover,

and not one of them taught that there was a substance which, in and of itself, without admixture with other substances and without the use of steps other than mere application to the egg, would have the desired preservative effect and yet leave the egg with practically its original, natural appearance or bloom, and without odor, color or taste.

"In other words, it is evident from the art referred to that Henderson was the first to discover and employ a substance capable of preserving eggs and which alone, and without other admixture, has each and all of the requisite characteristics, to-wit, absence of color, absence of taste, absence of smell, and which was non-volatile and non-drying so as to remain effective on the shell of the egg for a considerable period of time and yet leave thereon no coating which in any way affects its appearance. Likewise, he was the first in the art to utilize such a material with the aid of heat, as disclosed and claimed in his second patent. And, needless to say, he was the first to produce as a new article of manufacture an egg treated by this method. His inventions, therefore, are not only novel over the art in material respects but are the result of the exercise of an inventive genius which reduced unsuccessful complexity to successful simplicity, and, therefore, are inventions of the highest order.

" 'To obtain absolute simplicity is the highest trait of genius.' Dececo Co. v. Gilchrist (C. C. A.) 125 F. 293, 298.

" 'The derrick of the patent is singularly simple. It is excelled in that regard by no other derrick shown in the testimony. Its simplicity is its chief claim to excellence, though it was its undoing in the court below.' Neill v. Kinney (C. C. A.) 239 F. 309, 313.

"This fact is amply borne out by the history of the patents which Henderson obtained for such inventions.

"It is not necessary, in order to verify the above statements, to go further back in the history of the patents than their acquisition by the present claimant. Such acquisition was possible only upon the payment of twenty-five thousand ($25,000) dollars, a price most eloquent of the value and importance of said patents. Since the acquisition of said patents by plaintiff a large number of concerns have processed eggs as licensees under such patents. As indicated by Plaintiff's Exhibit 13, over one hundred and sixty such licensees have employed the inventions of the Henderson patents commencing with the year 1925 to date, and during said period

have processed over three and a half million cases, each containing thirty dozens of eggs."

On the other hand, the position of the appellee is tersely stated in its brief as follows:

"The patents in suit are extremely simple. They relate to the preservation of eggs by treating such eggs with oil. Eggs dipped in oil have been known for over a century. Various kinds of mineral and vegetable oils were used.

"The patentee, Henderson, did not invent 'liquid petrolatum' or any other oil; he did not invent the method of preserving eggs by using oil; nor did he invent a machine. At most, he merely selected and substituted a more highly refined mineral oil for the oils previously used. The method of treating eggs remained the same and the result was the same.

"Under well established rules of patent law the patents are invalid for want of invention and also because of anticipation. Judge St. Sure, in a carefully considered opinion, so found, and it is submitted that the evidence fully supports such conclusion."

In considering the state of the art of preserving an egg by closing the pores of its shell, attention is called to an article published by Benjamin Franklin concerning the preparations necessary or advisable by a passenger for a long sea voyage. He says, "You ought also to carry with you  *  *  * eggs dipped in oil. * * *" Appellee finds in this suggestion, published in Franklin's writings and now accessible in public libraries, a complete anticipation of the art claimed to have been invented by Henderson. Appellee's position on that matter can best be stated by quoting from its brief, as follows:

"Over a hundred years ago this problem was solved. Before the year 1790 it was known that oil was a suitable medium for closing the pores of an egg for purposes of preservation. Benjamin Franklin, the American patriot, in a published work, recommended that eggs be preserved by dipping them in oil. From that time to the present time eggs have been kept fresh by treating them with oil. The oil clogs up the shell pores and the egg will be preserved. Eggs are so treated in the season of greatest productivity and are stored until such time as they become scarce and expensive.

"It is apparent that many different varieties of oil could be used in this process. That used by Franklin was the oil then avail-

able on the market. In later years, when the art of refining oil developed, many new and purer oils unknown in Franklin's time were being marketed. That eggs could be preserved by treating them with oil was common knowledge. Those desiring to keep eggs by this method only had to select the best oil available for the purpose, at the time such eggs were to be treated. The substitution of one kind of oil for another did not change the process. It remained the same. Oil still was used as the medium for closing the pores of the egg shell."

Appellant's brief would, however, indicate that Franklin's advice to dip eggs in oil was entirely too vague to indicate what was proposed to be done or the results it was hoped to achieve thereby or the actual result attained by the process. Appellant states in that regard, as follows:

"At the trial the defendant placed great stress on this exhibit as showing the same method of processing eggs as is disclosed in the Henderson patents in suit and Judge St. Sure relied upon it as the next premise upon which his conclusions were based. This exhibit discloses an article by Benjamin Franklin, entitled 'Precautions to be used by those who are about to undertake a sea voyage,' in which he lists the provisions suggested for a long sea journey. Included among the provisions which he suggests appear the words 'eggs dipped in oil.' Nothing is stated as to the purpose for which the eggs were to be dipped in oil; nothing is remarked as to the preservation of eggs when dipped in oil; nothing is said as to the quality or kind of oil to be used and the character of eggs to be so dipped in oil is left to conjecture. Did the eggs become rancid after being so dipped? Were they edible? Did they have an odor or color or taste? These and countless other questions remain unanswered and undisclosed by this exhibit. The publication therefore leaves these essential facts as to the character of the disclosure entirely to surmise and conjecture. Such a disclosure is clearly insufficient to affect the validity of any patent.

" 'The patent law requires certainty of expression, and not merely conjectural allusion or ambiguous reference to the subject-matter, before a prior patent can overcome the validity of a later one that has meritoriously progressed the art.' A. B. Dick Co. v. Underwood Typewriter Co. (D. C.) 246 F. 309, 312, affirmed (C. C. A. 2) 252 F. 990.

"And this meaningless exhibit is practically the foundation of the trial court's deci-

sion that the patents in suit are void for want of invention! As we will hereafter show, the burden of proving lack of invention is on the defendant, and this defense must be established beyond a reasonable doubt. Franklin's musings although pleasant reading certainly far from accomplish this purpose.

"Can it be said that said exhibit meets the test of what a prior publication must contain in order to defeat a subsequent patent as laid down in this circuit in the case of Consolidated Contract Co. v. Hassam Paving Co., 227 F. 436, wherein Judge Morrow said, commencing on page 441:

" 'The rule is that a description in a prior publication, in order to defeat a patent, must contain and exhibit a substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person, skilled in the art or science to which it appertains, to make, construct, and practice the invention patented. It must be an account of a complete and operative invention, capable of being put into practical operation.' "

These deficiencies, however, if they be such, were supplied to some extent at least by subsequent disclosures contained in patents issued by this and other governments which we will now consider.

In 1869 letters patent were issued by the United States Patent Office to John Longmaid of New York City. This invention of a process for preserving eggs specified the removal of air from the egg by placing the egg in a partial vacuum and then surrounding the egg with carbonic acid gas, which would be absorbed through the shell. The portion of the specifications of interest in this proceeding is the specification that, after the exchange of the air for the carbonic acid gas in the egg, the pores of the egg were to be closed by the application of oleaginous or mucilaginous substances. We quote from the patent as follows:

"This invention relates to a new and useful improvement in preserving eggs for market and use, and consists in the process hereinafter described, whereby eggs may be preserved, fresh and fit for use, for an indefinite period of time. * * *

"The eggs may now be taken from the vessel and covered (by immersion or otherwise) with any suitable material for filling the pores of the shell. Oleaginous or mucilaginous substances are suitable for this purpose, or lime water may be used with good results. * * *

"Instead of injecting carbonic acid gas after the air has been extracted from the air cells in the eggs, I may inject either of the above mentioned substances for filling the pores of the shell, but I prefer to fill the air cells with the carbonic gas, as it renders the process more complete.

"The substance for filling the shell pores may be injected before the eggs are taken from the vessel, or immediately after the introduction of the carbonic acid gas, if desired, the vessel being slightly agitated, to insure the perfect covering of each egg with the liquid."

Ferdinand Cassel of Cologne, Prussia, was issued a patent from the United States Patent Office dated August, 1870. This patent provided for the preservation of meat and other articles of food by coating them with oil obtained from grape seeds. The patent disclosed the method of producing the oil from grape seeds by expressing the oil or by extracting it chemically. He says: "By expressing, the oil is obtained directly, and very little colored, but this method does not give much oil. * * * By the other mode of extraction, nearly all the oil existing in the corns is obtained, but the oil is very darkly colored; nevertheless it is clear, and free of all slime."

He stated that eggs "may be similarly preserved by coating them with oil obtained from the corns of grapes." The claim of the patent is as follows: "The improved method of preserving an article of food by coating it with the oil obtained from the corns of grapes, substantially as before set forth."

In 1872 a French patent, No. 94,226, was issued to Ginet and Caudrelier for a method of water proofing and preservation of organic materials "by means of some hydrocarbon mixed in certain proportions with paraffine employed at a temperature of heating of 50 degrees (90° F.), we obtain a water-proofing and a complete preservation."

In 1875 the United States Patent Office issued a patent to Frank D. Stone and Worthington Murray for an improvement in an apparatus for preserving eggs. The significance of this invention so far as the case at bar is concerned is solely because of the fact that it assumes that the method of preserving eggs by coating them with paraffin wax or any other melted substance was well known. The specifications state: "Our invention relates to improved machinery for use in preparing eggs to preserve them; and consists in a receptacle for holding paraffine or other coating compound surrounded by a steam or hot-air jacket and a separate air-tight receptacle situated over the same for holding the eggs to be treated."

In 1882 the British government issued a patent to Henry Harrison Doty of a somewhat similar nature. This patent provides for the covering of eggs "with such substance as paraffine or other substance intended to close the pores of the egg shell and exclude the air * * * the eggs being placed in frames or cage are lowered into the cylinder the substance in the lower half in paraffine having been previously melted the cover is adjusted onto the Indian rubber ring or packing; then communication is made with the vacuum engine and when the desired exhaustion has arrived the rod with the frames or cage is lowered into the now liquid paraffine. * * *"

In 1883 provisional specifications for a patent were filed with the British Patent Office by James Yate Johnson for method of preserving food. The specifications provide: "This invention relating to the preservation of food and other animal and vegetable substances consists in the utilization as hereinafter described of the antiseptic properties possessed by certain paraffins or hydrocarbons variously known as 'Petreoline' vaseline or soft paraffin."

This patent describes in detail the method of manufacturing the "petreoline" and describes its qualities as follows:

"The 'Petreoline' thus obtained is white or red in various shades and appears as a homogeneous mucilaginous paste somewhat tenacious, very unctuous and yielding readily to pressure but never showing any exudation of oil and is inodorous and tasteless.

"Melting at about 35 degrees Centigrade it boils at 300. Its density at 50 degrees Centigrade is 0.840. It is desirable to protect it from the solar rays as a prolonged exposure to the light develops a slight odour of petroleum. 'Petreoline' dissolves in various proportions in fatty substances, essences sulphuret of carbon and chloroform and ether. In the latter case the solution is more readily effected at an elevated temperature. * * * Damp air, salts and oxides are without effect upon 'petreoline,' which is incapable of turning rancid or of saponification, being a natural mixture of liquid and solid hydrocarbons in the proportion of about 74 parts by weight of liquid hydrocarbon to 26 parts of solid hydrocarbon."

The patent was issued March 25, 1884. In addition to the description of petreoline

contained in the preliminary specification, we have this further description: "The 'petreoline' thus obtained is white or red in various shades and appears as a homogeneous mucilaginous paste somewhat tenacious, very unctuous and yielding readily to pressure but never showing any exudation of oil and is inodorous and tasteless."

It was evidently the opinion of the patentee that this invention could be used for the preservation of eggs. In that regard he says: "According to this invention meat, fish, fruit, vegetables, eggs, custards, oils, fats and in general all organic matter of animal or vegetable origin are preserved from deterioration or decay by the application of this substance as hereinafter described."

Marvin L. Chappell, a chemist, expert in dealing with petroleum products, testified with relation to this patent that the product "petreoline" described in the patent is a mineral oil, odorless, tasteless, and nonvolatile at all temperatures, that it would be a liquid oil at normal temperature. The witness says the percentage of oil and low percentage of solids "would necessarily mean it would be a liquid and that the food to be preserved, such as eggs, could be dipped into it readily."

In 1900, the German Patent Office issued a patent to E. Utescher for the preservation of eggs. In this patent it is stated:

"It is known that eggs can be preserved by first coating them with vaseline and keeping the coated eggs in lime solution. * * * The process of coating the eggs with such a coating of vaseline and then immersing them in a preserving solution is on the one hand inconvenient. * * *

"In contrast to this known process the foregoing process consists therein that the egg shells before the eggs are placed in the preserving fluid are moistened with paraffine oil to such an extent that the access of the preserving liquid to the pores is not completely prevented but on the contrary the penetration of the preserving liquid to the inside of the eggs is diminished and the necessity for the purification of the egg shells before the use of the eggs is avoided. * * *

"The eggs which if need be are first candled so as to separate the good eggs from any bad ones that may be present are then brushed with a small brush which has been soaked in a little paraffine oil. This may also be done in such a way that a glove soaked in paraffine oil is drawn over the right hand and the eggs wiped. The layer of fat which in this way gets on the egg shells is hardly noticeable. * * *

"* * * It is only necessary for the paraffine oil mixture to be easily distributed in a very thin layer. * * *

"The comparative tests which have been carried out with the same eggs without the slight impregnation of the egg shells with paraffine oil, on the other hand by the use of this process, were very much in favor of the foregoing process. * * *

"Process for preserving eggs, distinguished thereby that the egg shells before being placed in the preserving liquid are moistened with paraffine oil."

In 1901 Dr. Teisler, of Germany, procured a patent for the preservation of eggs. This patent is of interest in the case at bar solely because it assumes as a well-known fact that the cause of spoilage in eggs is the penetration of the shell by bacteria, and that the preferred method of preventing such action is by stopping the pores of the shell with various substances, among others mentioned being grease or vaseline. We quote from the patent as follows:

"A good egg preservative must therefore be in a position firstly to kill the bacteria already existing on and in the egg shell, and secondly to prevent the entrance of further bacteria into the egg. The latter can be only effected by the numerous pores of the egg shell being stopped up. Eggs preserved in a suitable manner should, of course, suffer neither in smell, taste nor appearance.

"Lime water, salicylic acid, copperas, water glass and grease are the substances most usually employed for preserving eggs. None of these substances, however, completely comply with the requirements necessary for an egg preservative, although some of these substances in practice have a reputation for good results. Very curiously greater preference is not given to the substances which are characterized by their bacteriacide qualities, such as salicylic acid, but rather to those about the bacteriacide action of which little is known and which only act by stopping the pores, such substances for instance as water glass, grease or vaseline."

In 1903 the United States Patent Office issued a patent for the preservation of eggs by the application of a composition composed principally of lard, petroleum jelly, paraffin, and beeswax, with small quantities of formaldehyde and oil of citronella.

In 1905 a British patent was issued to

Pauli and Mach. This patent had largely to do with the cleaning of the egg before the pores of the egg shell were filled "with paraffine or the like." One of the claims of this patent is as follows: "Eggs having the pores in the shell filled with some substance affording no food for bacteria (such as paraffine, wax or the like), the impregnating material covering also the inner surface of the shell in a homogeneous thin layer."

June 14, 1904, the United States Patent Office issued a patent to W. H. Strickler. The invention claimed for this patent was one for the immersion of the egg in paraffin oil while the egg still retains the animal heat from the body of the hen. The proposed scheme of the inventor was to have the hen lay the egg in a nest immediately over an oil bath into which the egg would drop as soon as laid. In short, the scheme was one to have the hen apply the preservative. The patent assumes as a well-known fact that the immersion of an egg in paraffin oil would tend to close the pores and thus preserve the egg. It will be observed in considering the portions of the patent which we shall presently quote that it was essential to the efficacy thereof that the bath into which the egg was dropped should be liquid at ordinary atmospheric temperature.

"In practicing my process I provide means for rendering impervious to air the shell of the egg while it still retains the animal heat of the fowl and while its contents are still expanded, whereby when the egg subsequently cools and the contents thereof contract, air does not pass through the shell to the interior thereof, such as occurs upon the natural cooling of an unprotected egg. I employ for the air-excluding medium any suitable substance by which the exterior of the egg shell may be invested, the medium being preferably applied to the shell in a liquid state and of such nature that upon the cooling of the egg the external air-pressure forces the substance into the pores of the egg shell, whereby the shell becomes impervious to the air and excludes its entrance to the interior thereof. Paraffine oil possesses the desired air-excluding qualities when applied in the manner hereinbefore mentioned, and I have used this substance with a high degree of success. Said air-excluding medium should be applied to the egg before the latter has lost any appreciable amount of its temperature in order to secure the best results and to this end should be applied to the egg shell as soon as practicable after the egg is laid."

In 1908 a French patent was issued upon a method of preserving products, including eggs, by immersing them in melted paraffin. In the patent it is stated: "It is evident that one might replace the paraffine by a substance or a compound of analogous substances such as yellow or white wax, spermaceti, Judea pitch, etc., provided that the material used is without odor or taste and in no way attacks the organoleptic qualities of the foods and forms a coating impermeable to air."

In 1909 a French patent was issued to Etard and Lambert for the preservation of eggs. The patent discusses the previous state of the art of preserving eggs, and, among other things, contains the following: "The methods of preservation consist in coating the shell of the eggs with an odorless varnish such as oil, paraffine, etc., or in placing the eggs in lime, straw, sawdust, bran, ashes, etc., will prevent the air from penetrating through the holes in the shell but will not destroy the spores and the myceliums which continue to develop in spite of the outer protective envelope."

The purpose of his invention was to overcome the objections to the known methods of preserving eggs. This process, in short, consisted in immersing the egg first in a "liquid of a harmless nature brought to a high temperature * * * this liquid being capable of closing up, after the immersion, the orifices of penetration presented by the shell. * * * This liquid must not give any taste to the eggs and must be capable of stopping up the holes of the shell after their immersion.

"It is possible to employ, to obtain this result, an antiseptic solution of suitable nature, grease, edible oil or neutral oil, paraffine," etc.

The significant thing about this patent, from the standpoint of present inquiry, is the fact that the author of the invention requires a liquid such as a neutral oil or paraffin which is tasteless, and, as the patentee recognized, should be odorless.

In 1911 a United States patent was issued to Peterson and Clairemont for an egg-preserving compound in which the egg was to be dipped. The liquid was a compound composed of one-third juice of cactus and two-thirds cotton-seed oil.

In connection with these various patents defendant introduced evidence, the purpose of which was to show that the petrolatum specified in the Henderson patents was nothing more nor less than the paraffin oil men-

tioned in a number of the foregoing patents. In order to establish this fact, the United States Pharmacopœia, authorized by the United States Pharmacopœia Convention held in Washington May 11, 1922, was offered in evidence wherein liquid paraffin, white mineral oil, paraffin oil, and liquid petrolatum were described and treated as synonymous. The articles described it as "colorless, transparent, oily liquid, free, or nearly free, from fluorescence."

The United States Pharmacopœia authorized by the convention held May 10, 1910, also treats liquid petrolatum and liquid paraffin as synonymous, and describes it as follows:

"A colorless, transparent, oily liquid, free or nearly free, from fluorescence, odorless and tasteless when cold, and possessing not more than a faint petroleum odor when heated.

"When cooled to 10° C., liquid petrolatum does not become more than opalescent (solid paraffine)."

In 1914 the United States Dispensary, based upon the ninth convention of the United States Pharmacopœia (1910) and the British Pharmacopœia (1914), describes the characteristics and methods of manufacture of petrolatum, and states that this article has been marketed under many names, including liquid paraffin, liquid vaseline, nutraloil, paraffin oil, Russian mineral oil, Russian paraffin oil, white paraffin oil. The appellant claims that, although these publications show that paraffin oil and petrolatum were synonymous terms at the time they were issued, they do not prove that by the term "paraffine oil" used in some of the patents the patentee intended to designate "petrolatum," for the reason that this product is of comparatively recent manufacture, and was therefore unknown at the time of the foregoing patents. It appears that the product was first used in this country under the name of Russian oil, but that after the World War began the supply of Russian oil was shut off, and our own refineries produced a product which is marketed under the various names hereinbefore mentioned. From an inspection of the foregoing patents, it is clear that each patentee had in mind an odorless and tasteless oil to be applied to the egg shell. It is clear that an oil that did not deteriorate and become rancid and one that was colorless, and therefore did not change the appearance of the egg, was desirable. Liquid paraffin was used for this purpose. It is probably true that the paraffin referred to in most of these patents as an oil had been reduced to liquid form by increasing its temperature above its melting point. When so melted, it had all the attributes of petrolatum, with the single exception that it had a higher melting point, that is to say, liquid or molten paraffin had the exact qualities described in the Henderson patent, in that it was odorless, colorless, nonvolatile mineral oil. Henderson, in his specifications, recognizes the prior use of paraffin oil for the purposes of preserving eggs, and in that regard he differentiates his patent as follows:

"With this material I believe, and as far as I now know from experiments and extensive tests, the pores of the shell are not entirely or completely closed, as would be the case with a waxy material, such as paraffin or paraffin oil. This I believe is important from a scientific standpoint inasmuch as by the partial sealing of the pores, objectionable or destructive bacteria are prevented from entering through the pores, while the molecules of oxygen and ozone are permitted to enter through the shell."

The idea of using an oil or grease, however, as appears from the foregoing quotations from patents, is not new in the art of preservation of eggs. At most, the specifications of Henderson's patents indicate that the use of paraffin had the disadvantage that it was not an oil at ordinary temperature.

While the use of paraffin with its higher point of liquidizing was pointed out as objectionable by the patentee, it should be observed that various patents above mentioned specified liquid vaseline; that is, vaseline melted by the application of more heat than average atmospheric temperature.

We think there was no invention involved in the selection of an odorless, tasteless, colorless, nonvolatile mineral oil as a suitable oil in which to dip an egg for human consumption. If, however, we assume, as appellant contends, that there was some inventive genius shown in the selection of an oil for that purpose which has recently been placed on the market which had all the characteristics of the familiar oil, melted paraffin, except a lower melting point, then we are faced with the fact that as early as 1883 Johnson, in the specifications of his patent for the preservation of food, recognized the desirability of using hydrocarbon derivatives from petroleum for the purpose of preserving food; that he described the method of manufacture of such a derivative which he named "Petroline," which was white, odorless, and tasteless, and nonvolatile, and com-

posed of hydrocarbons, and having a density of 50° C. (90° F.) of .84 and a melting point at 35° C. (67° F.), and was therefore an oil at usual atmospheric temperature. It is probable that the product, petroline, described by Johnson in his British patent of 1883, is not substantially different except in degree of refinement from the petrolatum described in appellant's patent, although it has a somewhat higher melting point. In view of all this evidence, the learned trial judge stated that:

"All that patentee Henderson did was to select and substitute a more highly purified mineral oil for the oil previously used in a well-known process for preserving eggs.

"I am therefore of the opinion that both of the patents sued upon are void for want of invention."

With this view we fully concur.

Judgment affirmed.

SAWTELLE, Circuit Judge, concurs.