### CHEMICAL CONST. CORP. et al. v. NIAGARA RESEARCH CORP.

#### Civ. A. No. 4198.

United States District Court
W. D. New York.

Oct. 23, 1950.

---

Dudley, Stowe & Sawyer, of Buffalo, N. Y. (Watson, Johnson, Leavenworth & Blair-Leonard A. Watson and John T. Kelton, all of New York City, Daniel E. Igo, of Stamford, Conn., of counsel), for plaintiffs.

Bean, Brooks, Buckley, & Bean (Edwin T. Bean and John B. Bean), of Buffalo, N. Y., for defendant.

KNIGHT, Chief Judge.

This is an action for a judgment declaring United States patent 2,459,764 invalid and void and that plaintiffs have not infringed its claims. Defendant counterclaims against plaintiff National Lead Company, alleging infringement and demanding an injunction, accounting and costs.

Plaintiff Chemical Construction Corporation is a Delaware corporation. Plaintiff National Lead Company is a New Jersey corporation. Defendant is a New York corporation, having its principal office at Buffalo in this District.

The patent is entitled "Purification of Native Sulfur", was applied for June 14, 1945, and issued to Frank M. Yeiser January 18, 1949. By mesne assignments it is now owned by defendant. It makes two claims. Defendant now admits that only claim 1 is being infringed. This claim as set forth in the complaint reads as follows:

"1. A method of purifying raw native sulphur containing contaminations including dirt particles, sulphuric acid and moisture but free of such contaminations as arsenic and antimony which consists in mixing with said sulphur an acid-neutralizing material chosen from the group consisting of oxygenous compounds of calcium and barium, the chosen material being added in a state in which it is capable of combining with sulphuric acid and moisture contaminations in the sulphur with the production of products which are insoluble in molten sulphur, the quantity of material which is added being in substantial excess over the quantity required for combination with said acid and moisture contaminants and thereupon conducting the sulphur in a molten state through a filter consisting in part at least of an acid-reactant metal whereby the sulphur contaminations and the added neutralizing material in combined and uncombined state are removed from the molten sulphur conducting said contaminated sulphur."

Defendant in its brief urges: "The last four words of claim 1 should not be in the patent, as they are in a misprint on the part of the Government Printing Office" and relies on Plaintiffs' Exhibit No. 2.

The complaint alleges that Frank M. Yeiser, designated as the inventor of the patent in suit, was not the original and first inventor because his alleged invention was anticipated in the following three patents:

| No. | Patentee | Date |
|---|---|---|
| 1,396,485 | E. F. White | November 8, 1921 |
| 1,918,684 | E. E. Bragg | July 18, 1933 |
| 1,970,147 | S. I. Levy | August 14, 1934 |

It is further alleged that every material and substantial part thereof was disclosed in a published article by Bacon and Fanelli entitled "Purification of Sulfur" in Industrial and Engineering Chemistry, Vol. 34, pages 1043–1048 (Sept. 1942).

In an amendment to the complaint it is alleged that every material and substantial part of the Yeiser process was in public use by Duval Texas Sulphur Company at Orchard, Texas, more than one year prior to filing the patent application.

In a further amendment it is alleged that the patent is invalid "10(g) Because for the purpose of deceiving the public the description and specification filed by the said Frank M. Yeiser in the United States Patent Office was made to contain less than the whole truth relative to his alleged invention, or more than is necessary to produce the desired effect."

The contention of the parties in this suit is well summarized at the conclusion of their briefs.

Plaintiffs say: "It is submitted that the patent in suit is invalid. It was improvidently granted by the Patent Office in ignorance of the actual state of the art and on the basis of misrepresentations by the patentee. The totally undisputed evidence of the prior art now before this Court proves that the subject matter of the patent was both obvious and old, and that the claims are not infringed."

Defendant says: "The evidence is clear that the presumption of the validity of the Yeiser patent by reason of its issuance by the Patent Office, has not been overcome by the plaintiffs in this action and therefore both claims 1 and 2 of said patent are valid. The showing of the infringement by National Lead Company by reason of its use of the process at the Sayerville plant at New Jersey, is clear and the process as practiced there constitutes an infringement of claim 1 of the patent."

Claim 2 is substantially the same as claim 1 except that it substitutes after the words "acid and moisture contaminants" these words—"and thereupon conducting the contaminated sulphur while molten through a filter consisting of a metallic screen coated with pulverant filter-aid material, the latter including an acid-neutralizing of the class hereinabove indicated, whereby the sulphur contaminations and the added neutralizing material in combined and uncombined state are removed from the molten sulphur."

The facts relative to the alleged infringement of claim 1 by National Lead Company have been stipulated in writing by the attorneys for the parties.

The patent in suit is a process patent. "A patentable process is a method of treatment of certain materials to produce a particular result or product." Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 255, 48 S.Ct. 474, 478, 72 L.Ed. 868, quoted by this court in Aeration Processes v. Walter Kidde & Co., D.C., 77 F.Supp. 642, 644.

The patent involves only methods for the "purification of native sulfur" and does not concern the manufacture of sulfuric acid. The claims are limited to "purifying raw native sulphur containing contaminations including dirt particles, sulphuric acid and moisture but free of such contaminations as arsenic and antimony." They both involve the use of "an acid-neutralizing material chosen from the group consisting of oxygenous compounds of calcium and barium" and a filter. No drawing accompanied the patent application.

In the description of his process, Yeiser alleges: "Industrial storage and handling methods as applied to native sulphur derived from underground deposits or the like invariably subject the sulphur to various soil contaminations requiring the sulphur to be subsequently cleaned prior to use thereof as for example in the manufacture of sulphuric acid by the so-called 'contact' process. The contaminations referred to will

often include appreciable quantities of dirt and cinders and rust and organic matter and other debris resulting from exposure when openly piled in stock yards and/or transferred in railroad cars and the like * * *. Incidental to storage and transportation the native sulphur also becomes exposed to oxidation and moisture absorption sufficient to produce therein varying amounts of free sulphuric acid."

The fact that weathered sulfur contains small quantities of sulfuric acid had been known for many years. In the application for the White Patent No. 1,396,485, filed February 25, 1920, the inventor states: "When sulfur is exposed to the atmosphere it generates sulfurous acid and sometimes sulfuric acid due to the chemical reaction between the sulfur and the air or moisture, thereby unfitting it for many commercial purposes such, for instance, as in vulcanizing processes and it is for the purpose of removing the objectionable acid from the sulfur that I have devised my present invention." That patent was issued November 8, 1921. In the 11th edition of the Encyclopaedia Britannica, published in 1911, *sub voce* Sulphur, it is said: "It should be noted that the oxidiation of sulphur itself by atmospheric influence may give rise to sulphuric acid, which in the presence of limestone will form gypsum." Vol. XXVI, p. 61. The same fact was noted in old standard chemical textbooks offered in evidence by plaintiffs. The oldest of these—Bloxam's "Chemistry Inorganic and Organic," published in 1895 (8th ed.) —states: "Finely divided sulphur, especially sublimed sulphur, is gradually oxidized and converted into sulphuric acid when exposed to moist air." p. 207.

In the description of his process, Yeiser further alleges: "More specifically, the invention contemplates for the initial step addition to the raw molten sulphur of an acid neutralizing and dehydrating material such as is adapted to react with acid and/or moisture contaminations in the molten sulphur to produce only insoluble salt by-products * * *. It has been determined, for example, that material such as barium oxide; barium hydroxide, barium carbonate; calcium oxide; calcium hydroxide;

calcium carbonate; and the like may be successfully employed for the purposes hereinabove set forth * * *. Materials such as the above are adapted to neutralize any free acid in the molten sulphur and to free any excess moisture therein while producing only insoluble salt by-products such as will be retained upon the filter cake of the filtering unit to which the treated sulphur is subsequently fed."

Barium and calcium are alkali earth metals and unite with sulfuric acid to form insoluble salts. This fact was well known to chemists long before Yeiser applied for his patent.

Dr. Brooks, chemical expert who testified for plaintiffs, submitted a statement showing the reactions of calcium oxide (quick lime), calcuim hydroxide (hydrated lime) and calcium carbonate (limestone) with sulfuric acid. In all three cases calcium sulphate is formed—a highly insoluble solid. Defendant's 68 year old chemical expert Whitney admitted on cross-examination: "Q. How long has it been a part of your common knowledge that lime would neutralize sulphuric acid? A. Almost since I was out of school." On the trial no stress was laid on the barium neutralizers. Dr. Brooks said: "The lime either as quick lime or hydrated lime or as ground limestone is very, very much cheaper than any of the barium compounds which have to be manufactured." In the alleged violation of the Yeiser patent only hydrated lime was used.

The next step in the Yeiser process is the filtering of the molten sulfur to which the neutralizer has been added. In his description, Yeiser says: "In accord with the method of the present invention the molten sulphur which has been chemically treated as explained hereinabove is next passed through a filtering device comprising a metallic screen which in some instances will preferably carry a filtering cake composed of some suitable fibrous material. The filter screen structure may be of any desired physical form and arrangement, and the filtering cake material may be of any suitable type of which several suitable forms are presently available on the market. For example, the cake mate-

rial may comprise diatomaceous earth or any other chemically inert and pulverant material having suitable filtering characteristics. The molten sulphur will be thereby cleared of all solid impurities such as dirt or other soilage initially present or picked up therein during the storage and transportation of the sulphur prior to delivery for its intended use, and the molten sulphur passing through the metallic screening device will be free from corrosion producing acid while the insoluble salt by-products of the chemical treatment hereinabove referred to will become lodged upon the filter cake in such manner as to supplement the latter as a filtering medium." He then asserts "that the method of the invention renders employment of metallic screening or filtering devices to be highly practicable * * * and greatly reduces maintenance costs in such processes and time losses otherwise expended for repair and/or renewal of corroded equipment."

In the Bragg Patent No. 1,918,684, issued July 18, 1933, and claimed by plaintiffs to be anticipatory, the inventor in his application filed May 1, 1929, states: "Heretofore, sulphur has been melted by the passage of steam through steel coils placed within the pot or vessel in which the sulphur is melted. Such melters require frequent replacement of the steel coils, for in operation the coils become corroded and leaky within a relatively short period. I attribute this corrosion to the presence of weak sulphuric acid in the sulphur, since the corrosive action is particulary rapid when the sulphur contains moisture and the coils are not entirely immersed in the molten sulphur."

Bragg, however, did not propose to eliminate the corrosion by adding an alkali neutralizer to the molten sulfur. He continues: "One object of this invention is to provide a melter not involving steel coils and which is of rugged construction, is not corroded or otherwise deleteriously affected in operation and which is adapted to continuously and efficiently melt the sulphur charged thereinto." Although plaintiffs' Dr. Brooks testified that hydrated lime "has long been known and is probably the best known neutralizing agent for acids

in general", Bragg did not use it in his invention.

The Levy Patent No. 1,970,147, issued August 14, 1934, cited by the Patent Office and claimed by plaintiffs to be anticipatory, is entitled "Method of Treating Recovered Sulphur." It does not relate to "raw native sulphur". The English inventor, in his application filed in the United States January 22, 1931, says: "The sulphur obtained by physical methods from deposits of the native element contains generally only small proportions of mineral impurities, usually calcium sulphate or siliceous material. Sulphur recovered by metallurgical or chemical treatment of sulphide minerals, in which sulphur does not occur in the uncombined condition, on the other hand, is usually associated with more objectionable impurities, such as compounds of the heavy metals and of metalloids. Whilst sulphur obtained from native deposits is generally almost free from arsenic, that recovered from sulphide minerals frequently contains arsenic in considerable quantity * * *."

The Yeiser process concerns sulfur "free of such contaminations as arsenic and antimony."

Levy then continues: "The present invention has for its object to prepare from crude recovered sulphur a highly purified product, equal in quality to the best material obtained from native deposits, by a simple, cheap and highly effective method, and to recover the impurities if present in sufficient quantity in marketable form. It is based on the discovery that the oxides, hydroxides, carbonates, sulphides and similar compounds of many metals, and particularly of the alkali and alkaline earth metals, can be caused to react completely with arsenic and other impurities in sulphur when the latter is in the molten condition, the products of reaction being so readily and completely separable that no trace of impurity is left in the sulphur. The most suitable reagents for this purpose are the oxides, hydroxides, carbonates, bicarbonates, sulphides and hydrosulphides of the alkali and alkaline earth metals, and particularly of sodium, potassium and calcium."

There is no specific mention of sulfuric acid as an impurity.

Plaintiffs rely on the following language in Levy's description: "The products of reaction, together with any excess of purifying agent used, and some entangled sulphur, settle out, usually as a sludge or slurry, at the bottom of the container, leaving clear liquid sulphur above. The latter is run off, preferably through a simple filter, which may be of fine sand, asbestos, or metal gauze, or an arrangement of such materials together, or may be an organic fibrous material such as linen, jute, or other suitable textile. The filter serves to retain any foreign matter which has not completely settled out. Alternatively, the whole mixture of sulphur and foreign matter may be drawn off without settling, and caused to pass through the filter, preferably under pressure, by means of a pump, or by air or steam pressure. The sulphur so obtained is of a very high degree of purity, and is practically free from arsenic and 'ash'."

There is no mention of the corrosion of the filters by sulfuric acid in the molten sulfur.

Questioned about the Levy patent, plaintiffs' Dr. Brooks testified that it "clearly shows that both the lime and the products of reaction are highly insoluble and for all practical purposes insoluble in melted sulphur."

Plaintiffs further argue in their brief: "The Duval Texas Sulphur Company work, in 1941 and following, demonstrated that lime and calcium sulphate were both insoluble in molten sulphur and could be removed by filtration * * *. Also the Bacon and Fanelli article (supra) teaches that both magnesium oxide and calcium oxide as well as magnesium sulphate and calcium sulphate which are the respective products in neutralization of sulphuric acid, are insoluble in molten sulphur and may be removed by filtration to yield an acid free sulphur which contains no 'ash.' "

Depositions concerning the Duval method were taken at the office of the company at Orchard, Texas, March 17, 1950. In them it appears that Duval Sulphur and Potash Company, formerly Duval Texas Sulphur Company, purify native sulfur at their mine. It is dark colored when brought out of the ground. Borskey, Duval's chief chemist, thought that the dark color "is organic in nature and comes very probably from the fact that there are crude oil deposits on the dome and small amounts of that oil in contact with the sulphur." In February, 1941, he began to treat the sulfur with sulfuric acid "for bleaching purposes." He did not pour this acid into the molten sulfur but injected it in the form of a specially prepared clay— Super Filtrol—containing from .38 to 1.5% of free sulphuric acid. This was done to give the sulfur a lighter color. Since 1941, he added lime to neutralize the acid and used more than was required for neutralization. The lime was procured under the brand names of Kemical Oxide (substantially a quicklime made from high calcium limestone) and Kemidol Oxide ("consisting substantially of magnesium oxide and calcium oxide in approximately equal parts"). He said: "Q. Have you any explanation as to why you happened to hit on lime? A. That is a natural reaction when you are wanting to neutralize acids, I would say. Lime is a satisfactory neutralizing agent for acid and we had lime available." There was some sulfuric acid in the sulfur as it came from the ground but he could not state the amount. It was not enough to prevent the dark color. Witness said: "Our experiments had led us to the conclusion that sulphuric acid was beneficial in the bleaching of sulphur if used properly and followed by the proper treatments. We did not care, for reasons of safety to our employees, to institute a regular program of using sulphuric acid as such. It was a very hazardous chemical to handle. It was our feeling that that sulphuric acid that we wanted could be supplied in this Filtrol product to considerable advantage over the handling of liquid sulphuric acid, and we therefore asked the Filtrol Corporation to develop these products to our specifications for those reasons."

This process of sulfur decolorization was used by Duval from 1941 to 1944, when a different process was substituted, which

chemist Borskey said was "a trade secret" which he was not at liberty to disclose.

There was also testimony by witness Stoddard that after lime had been put in the molten sulfur it was found that the filter screens had not been eaten.

Although Duval's aim was "essentially decolorization", as stated by witness Stoddard, and not the removal of sulfuric acid caused by weathering of the sulfur and although Duval actually added sulfuric acid to the molten sulfur, the chemical principles utilized by Duval between 1941 and 1944 and by the patent suit are essentially the same. They both involve the neutralization of sulfuric acid by an alkali earth metal resulting in solid insoluble salts which do not pass through the filter with the molten sulfur.

Patentable inventions are defined in 35 U.S.C.A. § 31. An inventor is not entitled to a patent unless his invention was "not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than one year prior to his application, and not in public use or on sale in this country for more than one year prior to his application, unless the same is proved to have been abandoned".

J. W. Borskey, Duval's chief chemist, testified on cross examination:

"Q. And you introduced this process, according to your testimony, of using lime in the year 1941, and you have produced records here from the company's operations which would show the percentage of lime being used with respect to tons of sulphur being treated. Now, those records carry through either the entire year or a portion of the year of 1944. What has the company done since that time? Is it still using that process? A. Not necessarily.

"Q. What process or processes has it been using since that time? A. * * * I am not at liberty to disclose the process being used at the present time. It is a trade secret. We have operated since this period the filtration plant and are still operating it,

I understand. I can verify that. I am just in here today. I have not been here for some time. As I say, I am not at liberty to reveal to you now the details of the process under which we are presently operating.

"Q. You are the chief chemist in charge of the operations of processes of this particular plant today, are you not? A. Yes. * * *

"Q. Without asking you what the process is that you are now using, because you say it is a trade secret, then I am correct in the statement that I assume that it is something which is different from that that you have testified to that you used prior to '44; otherwise, it could not be a secret; isn't that correct? A. That is true."

It does not appear that the process used by Duval between 1941 and 1944 had ever been patented or that any application for patent had been filed. When in 1944, Duval substituted a secret process, it did not abandon any prior invention.

Defendant asserts in its brief: "It is true that both claims 1 and 2 are limited in their scope. They deal with a specific process to be used under certain specified conditions on particular material only. But they have proven to be of immeasurable importance in the purification of sulphur utilized in sulphuric acid plants. The invention is one of those which now seems simple, but which meets the needs and solves a problem which was long present in the sulphuric acid industry. All of the experts in that industry had failed to perceive the solution prior to Yeiser. Yeiser's invention reveals a flash of creative genius, not merely the skill of the calling * * *. It is a combination of elements with a new and useful use."

It appears that the commercial success of the Yeiser method resulted not from a "flash of creative genius" but to his diligence in promoting its use.

Dr. Werner W. Duecker, an expert chemist, testified on deposition: "When this question of dirt in sulphur came up, I tried to stir up an interest in manufacturers of filtering equipment. I saw Goslin in Birmingham, Adams, Oliver, and then there

was another company. None of them showed the interest in finding a new field for the application of their equipment, as Yeiser did. He was particularly interested. So, naturally, I referred a great many requests to him, because he was the one that sparked it."

Yeiser, in reply to questions by the court, said he did not know that sulfur contains any acid until he made experiments between March 20 and the end of the first week of April, 1944. In his affidavit of March 26, 1948, submitted to the Patent Office, he stated: "In a series of experiments he first discovered that small amounts of sulfurous and sulfuric acid were present in the molten sulfur, the acid content ranging from about 0.005% to 0.5%, the acid content most commonly being about 0.03%." The fact that weathered raw native sulfur contains such acids had been known to chemists for more than fifty years. Moreover, it was so stated in the application filed February 25, 1920, for White Patent No. 1,396,485.

In said affidavit, Yeiser further alleged: "The filtration or screening of the molten sulfur had been found to be impracticable. Experiments made by deponent with screens showed that such serious corrosion of and disintegration of screens occurred that the cost of filtration through conventional or cloth screens was impracticable. Stainless steel screens disappeared in a few days when in contact with molten sulfur. The operators of sulfuric acid plants regarded the corrosion of the metal members of screens and filters by sulfur unavoidable and believed the corrosion to be due to an inherent characteristic of molten sulfur. They were of the belief that nothing could be done about it * * *. Suspecting that this unsuspected acid content (sulfurous and sulfuric acid) was causing the trouble, he endeavored to find some harmless neutralizing reagent for acid * * *. (He) experimented with various basic additions to the molten sulfur. In order to determine the solubility of neutralizing agents for the acid reaction products in molten sulfur, he consulted various reference books with the hope of learning something about the solubility of compounds in sulfur but was unable to find any information on the subject. In order to get such information, he ex-perimented by adding various basic neutralizing agents to molten acid containing sulfur in different relative amounts * * *. Surprisingly, additions of various basic compounds of calcium and barium, which were combinable with sulfurous and sulfuric acids, did not form compounds which were soluble in sulfur."

The fact that molten sulfur containing sulfuric acid corrodes steel was stated in the application filed May 1, 1929, for Bragg Patent No. 1,918,684. The further fact that compounds of barium and calcium unite with free sulfuric acid to form salts insoluble in molten sulfur was well known when Yeiser made his alleged experiments. Such neutralization was being used on a large scale at the Duval plant in Texas since 1941. In the course of this treatment over 900,000 pounds of lime had been added to the molten sulfur prior to filtration.

Yeiser said on cross-examination:

"Q. With reference to the date of your conversation with Dr. Duecker in May of 1944, you testified by deposition last December as follows: 'I already knew, like most any chemist, that lime was a good neutralizing agent for free sulphuric acid * * * and would form an insoluble product.' Was that testimony a correct statement of your belief at the time given? A. That was the correct statement * * *.

"Q. And at that stage it was a matter of common knowledge among chemists, therefore, that lime would react with sulphuric acid to form an insoluble reaction product; is that correct? A. That is right, referring to molten sulphur."

Dr. Duecker testified on deposition that he had a conference with Yeiser in New York City on May 22, 1944, concerning corrosion difficulties and that he told Yeiser that corrosion of metallic filter screens was not due to the sulfur itself and that the logical solution would be to add lime or magnesium oxide to neutralize the sulfuric acid. In a letter to Yeiser dated May 23, 1944, Dr. Duecker wrote: "We believe that most of the corrosion attributed to sulphur is due to the presence of sulphuric acid in the sulphur. I would, therefore, suggest that before you engage in modifying your

filter leaf that attempts be made to neutralize the acid in the sulphur. This may be accomplished by adding finely divided lime or magnesium oxide directly to the sulphur. It also may be advisable to precoat the filter with lime or magnesium prior to filtering sulphur." This letter was received in evidence. Yeiser, however, emphatically denied that Dr. Duecker had told him to use lime.

The steps in the Yeiser process are simple and were well known to chemists in the sulfur industry long before Yeiser applied for his patent in suit. Their application in "purifying raw native sulphur" involved no flash of creative genius.

Defendant urges that his patent has been a commercial success. On this matter there is the testimony of defendant's own witness, consulting chemical engineer John B. Whitney, who said on direct examination:

"Q. Inasmuch as your work over the past five years * * * has included a recommendation to the sulphuric acid manufacturers to employ filters, I would like to ask you whether by that familiarity you can tell me what the attitude of the industry is toward the patent in suit? A. Well, most of the industry don't like the patent.

"The Court: These patents or a patent?

"The Witness: *The* patent that we are discussing."

Sulfur is an element of great importance in industry. Much of the sulfur both native and recovered goes into the manufacture of sulfuric acid, a chemical which plays a prominent part in the preparation of a host of other materials. The Yeiser claims relate only to a method of purifying raw native sulphur containing contaminations including dirt particles, sulphuric acid and moisture but free of such contaminations as arsenic and antimony." The use to be made of the purified sulfur is not stated.

At the trial there was much testimony about the manufacture of sulfuric acid in this country. Defendant's witness John B. Whitney testified: "Sulphuric (acid) manufacture in this country began before the year 1900 and it was principally done with the *chamber system,* which is a system of large chambers, some of them bigger than this room, which were used to convert the $SO_2$ to a form of $SO_3$ using nitro-acid or nitro-oxides as they call them and in the year 1900, approximately, the *contact process* was brought to this country principally by the General Chemical Company. New Jersey Zinc and du Pont were also interested. The advantage of the contact process to a company is that the equipment is very much more compact and they make a stronger acid which is unable to be made with the chamber plants. Therefore, the evolution of this sulphuric acid in this country has gradually gone over to the contact process which today is slowly replacing the chamber process."

Whitney further said: "There are two distinct types of contact plants * * *.

"Q. Would the filtration of the molten sulphur as practiced under this particular patent in suit, that is with the use of lime to neutralize any free acid, would the metallic leaf filters, is any of this difficulty which you have described in connection with the old method relieved to an appreciable extent? A. Very much so."

So-called Kelly filters have been available for filtering sulfur in acid plants since the contact method came into use. Whitney said: "The Court: Is it (the Kelly filter) the same as the patent here?

"The Witness: It is a similar type of filter * * *.

"The Court * * * In the Kelly patent do they coat those leaves?

"The Witness: That is right. Precoat. The same process.

"The Court: Do they have a filter beside that?

"The Witness: Yes they add either lime or an admix or Fuller's earth.

"The Court: Does Kelly add lime?

"The Witness: Yes, sir.

"The Court: And precoat?

"The Witness: That is right. Kelly does the same thing. The process is the same for both filters. It is a question of filter, whether you use a Kelly filter or the Niagara filter. It is the same process for both filters."

Whitney estimated that there are at least 125 contact acid plants in this country and that not more than 15 of them filter molten sulfur with the use of lime. He said:

"Q. You say during that period you recommended the use of filters. Did you recommend such filtering apparatus of any particular company? A. I would say that I have recommended the Kelly filter.

"Q. Made by the Oliver Filter Company? A. That is right."

On direct examination Yeiser named 13 plants which are now using his process of purifying molten sulfur by adding lime. He admitted on cross-examination that one of these plants purify recovered sulfur.

Yeiser did not discover any chemical law but merely applied chemical laws which were well known to industrial chemists when he applied for his patent. These chemical laws are stated and applied in the White, Bragg and Levy patents cited by plaintiffs and are mentioned in the cited Bacon and Fanelli article.

In Toledo Rex Spray Co. v. California Spray Chemical Co., 6 Cir., 268 F. 201, cited by defendant, the court said: "While in the light of the invention of the patent it may seem that it would naturally have occurred to one acquainted with the Bell & Fell disclosure to have tried the substitution of arsenic acid for sulfuric acid in making arsenate of lead, the fact remains that in the 40 years which elapsed since Bell & Fell it seems to have occurred to no one to try that experiment." 268 F. at page 204.

Yeiser, however, did not substitute any neutralizer of sulfuric acid which had never been used before he applied for his patent.

The White patent, issued November 8, 1921, used an "alkaline solution * * * to neutralize the objectionable sulfurous acid and other impurities in the sulfur." The Bragg patent, issued July 18, 1933, attributes the corrosion of steel coils "to the presence of weak sulphuric acid in the sulphur." The Levy patent, issued August 14, 1934, involved the "treating recovered sulphur" containing arsenic and antimony by "a metallic compound alkaline." While none of these patents are strictly antici-

pating of the patent in question, a process for purifying raw native sulfur substantially the same as that of Yeiser, was used at the Duval plant in Texas from 1941–1944. That barium compounds neutralize sulfuric acid was not discovered by Yeiser. They were apparently not used by Duval because they are much more expensive than the compounds of calcium.

The Yeiser patent lacks invention in not conforming to the conditions prescribed in 35 U.S.C.A. § 31. The following cases support this conclusion:

Butler Mfg. Co. v. Enterprise Cleaning Co., 8 Cir., 81 F.2d 711; In re Borglin, 86 F.2d 416, 417, 24 C.C.Pa., Patents, 739; In re Leamon, 87 F.2d 494, 24 C.C.Pa., Patents, 932; Thermolized Coal Corp. v. Coe, 64 U.S.App.D.C., 344, 78 F.2d 228; Globe Oil & Refining Co. v. Sinclair Refining Co., 3 Cir., 103 F.2d 95; Fiberjoint Corp. v. W. R. Meadows, Inc., 7 Cir., 112 F.2d 322; Kasser Egg Process Co. v. Poultry Producers of Central California, 9 Cir., 50 F.2d 141; In re Ebert, 57 F.2d 356, 19 C.C.Pa., Patents, 1087; McElrath v. Industrial Rayon Corp., 4 Cir., 123 F.2d 627; Pallas v. Newton Lines Co., D.C.N.D.N.Y., 47 F. Supp. 301.

"The statutes of the United States provide that anything to be patentable must be new and useful. 35 U.S.C.A. § 31. Novelty and utility are therefore two essential requisites to patentability * * *. A mere carrying forward of a known principle, or change in form, size, proportions or degree, or doing the same thing in the same way by substantially the same means, with better results, is not in itself invention." Tropic-Aire, Inc., v. Cullen-Thompson Motor Co., 10 Cir., 107 F.2d 671, pages 672 and 674.

Non-infringement of Claim 2 has been conceded.

Plaintiffs are therefore entitled to judgment declaring patent No. 2,459,764, issued to Frank M. Yeiser, Buffalo, N. Y., January 18, 1949, invalid and void. Defendant's counterclaim against the plaintiff National Lead Company is hereby dismissed. It is not necessary to consider defendant's contention that plaintiff Chemical Construction Corporation is not a proper party in this action.